## THE KASTEN CONSTRUCTION CO., INC. *v.* EVANS

[No. 209, September Term, 1970.]

*Decided February 2, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SMITH and DIGGES, JJ.

*James H. Langrall* and *John J. Ghingher, III,* with whom were *Weinberg & Green* on the brief, for appellant.

*John Brockenbrough Fox,* with whom was *Frank J. Blair* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Had he not been young and quick and agile the extraordinary accident which befell the appellee (Evans) quite likely would have killed him. Even so he did not escape unscathed. For the injury he sustained Evans and his employer's insurer sued the appellant (Kasten) and the Baltimore Gas & Electric Company (BG&E). The jury absolved BG&E but found for Evans against Kasten. Charging the trial judge, Cardin, J., with assorted errors, Kasten entreats us to overturn the ensuing ($55,000) judgment. We shall relate what happened before stating the issues and our resolution of them.

In the early summer of 1964 BG&E engaged Windsor Electric Company (Windsor) to install its meters in the newly completed houses of Kasten's residential development in the Glen Burnie area of Anne Arundel County. Windsor was required also to connect the meters to BG&E's overhead distribution lines, already in place. Evans and one Ballard, employees of Windsor, worked together as a two man team. Both were experienced linemen. On 1 May 1964 they were given a work order directing them to install a meter at recently completed 373 Fleagle Road and connect it to the overhead line at pole number 359853. This was accomplished without incident. On 12 June they were directed to install a meter at 375 Fleagle Road and connect it to the overhead line at the same pole. When they had finished installing the meter and its appurtenances Evans climbed the pole. Upon reaching the top he set his safety belt and with his back to the house he began to pull the slack out of the "loop" (the wire connecting the house to the overhead line). At

the third pull the pole fell toward the house. Evans tried to get around to the "high side" of the pole and to an extent he was successful; the pole did not crush him but it did fall on his right leg. As a result he was incapacitated for the better part of a year. On 12 November 1966 suit was filed in the Superior Court of Baltimore City. Some months later, upon the suggestion and affidavit of both defendants, the case was removed to the Baltimore City Court. Why this was thought to be a less hostile climate we fain would say, if we knew. Trial commenced on 9 December 1969 before Cardin, J., and a jury. Judge Cardin, after refusing to direct verdicts for Kasten and BG&E, submitted the case, with appropriate instructions, to the jury. Kasten's motion for judgment n.o.v. was denied whereupon it noted this appeal. Evans appealed from the judgment in favor of BG&E for costs but after the case reached this Court he dismissed his appeal.

The pole (359853), once a pine tree, was 30 feet long and because it had been treated with creosote it was known as a "black-jack." In accordance with the formula used by BG&E (0.10 x height in feet + 2 feet) it had been set in a hole 5 feet deep. It is customary for the maker of the pole to burn, with a branding iron, certain information on it; *e.g.*, size, classification, etc. The brand is usually found about ten feet from the base of the pole. After the pole has been planted in the ground a BG&E employee is supposed to affix a white metal tag (9½" x 3¼") on which is stamped the number of the pole. Usually the tag is placed at "eye level." While there is abundant evidence that it was the general practice of BG&E to affix these tags to its poles, there is no clear-cut evidence that one had been placed on this pole at any time before it fell.

William Wilkinson, the manager of the Electric Distribution Department of BG&E, testified that it was the practice of BG&E not to authorize the installation of poles in residential developments "until the final grading has been done." Normally, he said, it is required that the grading must have been finished "to something [within]

at least six inches \* \* \* [of] the final grade" and, he added, "we don't work until it has been done." Lewis Russell was a member of the gang that set the pole. He said it "was set five foot deep"; at the time "there was no grading, \* \* \* as far as [he] could see," and the construction of houses had not begun. He said he did not place a tag on the pole because that was the duty of the foreman in charge of the line gang. Whatever the reason no one from the "line gang" testified.

After the pole fell it was discovered that it had been in the ground to a depth of only 22 inches. This in turn led to the discovery that Kasten's grading operations had not been completed when the pole was set. Without notice either to BG&E or to Windsor, Kasten continued grading; in the end his men had bulldozed away three of the five feet of earth supporting the pole.

Kasten's main effort here is aimed at Judge Cardin's refusal to direct a verdict in its favor and his later denial of the motion for judgment n.o.v. Evans, argues Kasten, was contributorily negligent as a matter of law and if he was not, then, as a matter of law, he assumed the risk of injury. Kasten contends also that Judge Cardin fell into error by failing or refusing to instruct the jury in respect of the issue of assumption of the risk and by his failure to inquire into a conversation, during a recess, between counsel for Evans and a member of the jury.

## I.

We shall deal first with the question whether Evans was contributorily negligent as a matter of law. To sustain this contention Kasten assumes that the identifying tag was in fact on the pole between two and three feet above eye level just before Evans started to climb. He concedes, however, as we think he must, that the "testimony as to the presence of \* \* \* [the tag and the brand [1]] is \* \* \* conflicting." But, seeking to impale Evans on one

---

1. There was considerable discussion at trial about the brand but Kasten seems not to be making much of it in this Court.

or the other horn of a dilemma, Kasten argues that even if the tag was not there, he was negligent in not observing its absence.

Contributory negligence is the failure to observe ordinary care for one's own safety. "It is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances." *Potts v. Armour & Co.,* 183 Md. 483, 490 (1944). In *Tie Bar, Inc. v. Shartzer,* 249 Md. 711, 715-16 (1968), Judge Horney, for the Court, said:

> "* * * [I]f the injured person knew or should have known of the dangerous situation there is no right of recovery.
>
> * * *
>
> "* * * Our predecessors * * * [noted] in *Texas Co. v. W. B. & A. R. Co.,* * * * [147 Md. 167 (1925)] * * * that the real basis * * * [for] contributory negligence * * *
>
> > " 'arises from the failure of the plaintiff to use due care to avoid dangers which he knows from past experience exist on the premises to which he has been invited, or which he should know exist because of his knowledge of the character and kind of premises to which he has been invited, or because the dangers are so obvious that any ordinarily prudent man would see them and guard against them.' "
> > (147 Md. at 174)

Contributory negligence, like assumption of risk, is ordinarily a question for the jury. *Chalmers v. Willis,* 247 Md. 379 (1967). Kasten, of course, claims that it should have been taken from the jury. We have often discussed the standards to be applied in reviewing a denial of a directed verdict motion.

> "The familiar rule to be applied in determining whether the facts justify a holding that the

plaintiff was guilty of contributory negligence as a matter of law is that the act [or omission] so relied on must be distinct, prominent and decisive, and one about which reasonable minds would not differ in declaring it to be negligence." *Miller v. Mullenix,* 227 Md. 229, 232 (1961).

To the same effect *see Raff v. Acme Markets, Inc.,* 247 Md. 591, 600 (1967). If more than one inference can be drawn from facts in respect of the issue of contributory negligence, it must be submitted to the jury. *Tie Bar, Inc. v. Shartzer, supra* at 716. There may also be a jury question, even where negligence seems fairly clear, "when facts permit a finding that the injured party's conduct had its basis in a reasonable expectation." *Bennett v. District Heights Apts., Inc.,* 252 Md. 655, 659 (1969), quoting from 1 Shearman and Redfield, *Negligence* § 121 (rev. ed. 1941).

One horn of the dilemma, says Kasten, is that the tag, if present, is an infallible telltale showing how deep in the ground the pole has been set, that on the day the pole fell the tag would have been about nine feet above the ground, and that Evans's failure to heed its clear warning was contributory negligence as a matter of law. The other horn, he goes on to say, is that the absence of the tag should have warned Evans that a further investigation was in order and that his failure to take proper precautions for his own safety was likewise contributory negligence as a matter of law.

We do not think it is quite that neat. Both Evans and Ballard, the only linemen to testify, said, in effect, that Evans did what any experienced lineman would ordinarily have done in the circumstances. Each agreed that a high tag might indicate something was amiss but both said that looking for a tag was not a normal procedure to be followed before climbing and that nothing had ever been said about it during their training. Even the witnesses at the management level admitted that the tag was

not intended as a depth marker. Evans said "the number tag is sometimes put on the ground." Evans said he did not notice a tag when he climbed the pole; he had climbed other poles that were without tags; he "looked to see if it was there" but he "saw none." Had he seen a tag nine feet up the pole he "would [have] wonder[ed] about it"; he would have "call[ed] the company." He had no reason to think "this pole was any different from any of the other many poles that * * * [he] worked on." While neither Evans nor Ballard could be certain, it was established as a fact that one or the other of them had climbed the same pole on 1 May. Neither of them noticed any change in the grade. Indeed it is both possible and probable that the final grading had been completed when the pole was climbed on 1 May.[2] There would, therefore, have been no reason for either of them to suspect that what had been accomplished without incident in May could not have been repeated safely in June.

Kasten relies on *Southern Maryland Electric Cooperative, Inc. v. Blanchard*, 239 Md. 481 (1965), and *Lehman v. Baltimore Transit Company*, 227 Md. 537 (1962), for the proposition that "[i]t is a fundamental principle of negligence law that a person must use his Providence-given sense to avoid injury to himself." With that statement we are in accord but in those cases it is clear that the dangers were obvious — in *Blanchard,* uninsulated high voltage wires; in *Lehman,* a moving street car. Here there is in dispute both the existence and the significance of the tag and, even assuming its absence, there is testimony that Evans's procedure was not greatly at odds with what a reasonably careful lineman would have done in the circumstances. We do not think it was error to submit the issue to the jury.

## II.

In dealing with the contention that Evans, as a matter

---

2. In response to interrogatories by Evans concerning the dates of the grading, Kasten replied, "Exact dates unknown but the area was graded four or five weeks before the accident."

of law, assumed the risk of injury one must be mindful of the applicable and now familiar principles of law. In this regard we need go no further than *Gibson v. Beaver,* 245 Md. 418, 421 (1967). As stated by Chief Judge Hammond, who wrote for the Court:

> " 'When the plaintiff enters voluntarily into a relation or situation involving obvious danger, he may be taken to assume the risk, and to relieve the defendant of responsibility. Such implied assumption of risk requires knowledge and appreciation of the risk, and a voluntary choice to encounter it.' Prosser, *Torts,* § 55, p. 303 (2d Ed. 1955).
>
> "In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him. As Prosser in the work cited puts it at p. 310:
>
> > " '* * * In the usual case, his knowledge and appreciation of the danger will be a question for the jury; but where it is clear that any person of normal intelligence in his position must have understood the danger, the issue must be decided by the court.' "

We have held also that the doctrine of assumption of risk will not be applied unless the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff. *Chalmers v. Willis, supra.*

As we see it Evans assumed no risk in merely climbing the pole. He said there was no movement, no sway, no vibration or anything to indicate that the pole might become unstable. Had there been he "would have come down." It very well could be that on 1 May he had performed the same operation, on the same pole, after the final grading had been finished and, as we have said, with-

out incident. We think the evidence in this regard is sufficient to sustain such a finding by the jury. The risk, as it turned out, was the exertion of too great a strain on the "loop." His first pull left "too much sag." The second pull took out most of the sag, but not quite enough. It would be putting it too high, we think, to say that, as a matter of law, he knew, understood and appreciated the likelihood or possibility that a third pull would cause the pole to break out of the ground and that he voluntarily assumed that risk. Kasten, of course, argues that Evans should have known that the pole was only two feet or so in the ground and that, assuming such knowledge, he cannot be heard to say that he did not comprehend a risk which should have been obvious to him. But, as we have said, the evidence is not clear and undisputed. Judge Cardin's submission of the issue to the jury was not error.

## III.

Kasten's next assignment of error has to do with the denial of its requested instruction No. 8, which reads as follows:

> "That from the undisputed testimony in this case the plaintiff was an experienced lineman who knew that the markings and pole tags on poles were uniformly at or about eye-level when the poles, such as the one testified in the evidence, were sunk into the ground to a safe distance in accordance with standard safety practices of the industry; that if you find from the evidence that at the time the plaintiff started to climb the pole in question that its markings and tags were several feet above his head and that the plaintiff saw such markings and tags several feet above his head and thereupon climbed the pole, this was an assumption of risk on the part of the plaintiff under said circumstances and your verdict must therefore be in favor of the defendant, Kasten Construction Company, Inc."

and its claim that the trial judge failed to instruct the jury on the law of assumption of risk. What follows is an excerpt from the instruction given to the jury.

> "But, if you find that the accident was caused partly through the negligence of the defendant, the Kasten Construction Company, in the manner in which they graded the area around the pole, partly through the negligence of the defendant, the Gas & Electric Company, in the manner in which the pole was installed, yet if you further find that the plaintiff was also negligent in climbing the pole when he knew or by the exercise of ordinary care should have known that it was dangerous to climb said pole, then your verdict should be in favor of both defendants regardless of whose negligence was the greater."

It is at once apparent that the requested instruction contains a statement at odds with the evidence. Both Evans and Ballard denied ever having heard that tags were placed uniformly "at or about eye level." Evans said he knew of "no specified distance for the * * * tags." It was not error to deny the requested instruction as it was presented. We think *Western Maryland Ry. Co. v. Griffis*, 253 Md. 643 (1969), disposes of the question whether the quoted instruction to the jury was adequate. Judge Singley, writing for the Court, said:

> *"Did the court err in refusing to direct a verdict for Western Maryland or at least in failing to instruct the jury on Griffis' assumption of the risk?*
>
> "The simple answer to this question is that the defense of assumption of the risk may be invoked only when the plaintiff intentionally exposes himself to a known danger or is held as a matter of law to have done so. *Compare Sacks v. Pleasant*, 253 Md. 40, 251 A. 2d 858 and cases there cited *with Finzel v. Mazzarella*, 248 Md.

227, 230, 235 A. 2d 726 (1967). *See Honolulu Ltd. v. Cain, supra,* 244 Md. at 600; *Velte v. Nichols,* 211 Md. 353, 127 A. 2d 544 (1956) and *Yaniger v. Calvert Bldg. & Const. Co.,* 183 Md. 285, 289, 37 A. 2d 263 (1944). There was no testimony that Griffis knew of the danger.

"But even if this were not the case, the court's instruction on contributory negligence was broad enough to cover an assumption of the risk:

" 'Secondly, I will instruct you as to the duty of the Plaintiff to protect himself by the exercise of reasonable care.

'\* \* \*I instruct you that if you find that the Plaintiff knew or by the exercise of reasonable care could have known of any hazardous condition and chose to take such a route with a hazardous condition existing thereon and expose himself to such hazards, then that would be contributory negligence on his part and you would be bound to render your verdict for the Defendant.

" 'If you find that the Plaintiff knew or by the exercise of reasonable care should have known that he had a choice of two routes and further by the exercise of reasonable care that he should have known that one route was hazardous and one route was free of hazards, but chose to take the hazardous route with this knowledge and that his injury resulted from that action, then that would be contributory negligence on his part and you would be bound to render your verdict for the Defendant.'

"The line between contributory negligence on the one hand, and assumption of the risk, on the other, is a thin one. *Baltimore County v. State, use of Keenan,* 232 Md. 350, 193 A. 2d 30 (1963),

and we have held that an instruction can cover assumption of the risk without using those words, if the question is presented to the jury on the court's charge. *Bull Steamship Lines v. Fisher*, 196 Md. 519, 529, 77 A. 2d 142 (1950). There was ample evidence to support a jury finding that Griffis did not understand the risk of harm to which he was exposed. *Honolulu Ltd. v. Cain, supra*, 244 Md. at 600." *Id.* at 648-49.

## IV.

The incident out of which arises Kasten's final contention appears in the following excerpt from the record extract:

"(The following discussion took place in chambers, after the luncheon recess, out of the presence of the jury:)

"(Mr. Blair) I had made an appointment with an expert witness in the hall of the courtroom. I didn't know him, and he identified himself as a man who was bald. I did not, during the course of the trial, take particular note of all the jurors, and I inadvertently—there was a bald juror standing at the entrance to the Courtroom where I had made arrangements to see Mr. Shoals (phonetically). I went up to him and asked him if he was Mr. Shoals. He said, 'No. You look like somebody I know. I am on this jury.' He then indicated that he would not discuss anything with me, and I likewise immediately indicated to him that it was a mistaken identity, and I did not discuss anything further with him, but immediately and promptly walked away.

"(Mr. Langrall) I think on behalf of Kasten Construction Company, Incorporated, I have got to file a motion for mistrial.

"(Mr. Lerch) I join in that for the record.

"(The Court) Motion for mistrial is denied."

Conceding that *Safeway Trails, Inc. v. Smith,* 222 Md. 206 (1960), and *Rent-A-Car Co. v. Globe & Rutgers Fire Insurance Co.,* 163 Md. 401 (1933), leave the disposition of a motion for a mistrial based on irregularity in the conduct of a juror or an attorney to the discretion of the court, Kasten points out that in each of those cases the court fully investigated the alleged impropriety. He declares Judge Cardin abused his discretion by failing or refusing to initiate a similar inquiry. While we are inclined to agree that some inquiry, perhaps even a full inquiry, is desirable, we are not persuaded that Judge Cardin abused his discretion by denying this motion. The incident seems to us to have been trivial. The appellant made nothing much of it at the time. We have no reason for supposing that Mr. Blair is anything less than a thoroughly reputable practitioner. Judge Cardin was there on the firing line; he was in a position to make an intimate and firsthand appraisal of the circumstances; if we reversed the judgment because, in the circumstances, he thought further inquiry unnecessary, perhaps one might think us guilty of whimsy.

*Judgment affirmed.*
*Costs to be paid by appellant.*