747 A.2d 662

Ethel IMBRAGUGLIO et al.

v.

**GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. et al.**

**No. 80, Sept. Term, 1999.**

Court of Appeals of Maryland.

March 10, 2000.

196

Eugene A. Shapiro (Shapiro & Dorman, P.A., on brief), Baltimore, for petitioners.

Anthony G. Lardieri (Anthony J. Zaccagnini, Semmes, Bowen & Semmes, on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, HARRELL and ROBERT L. KARWACKI (retired, specially assigned), JJ.

RODOWSKY, Judge.

In this wrongful death and survival action the decedent was killed when he fell from a forklift-elevated pallet. The Circuit Court for Baltimore City entered summary judgment in favor of the defendants on the ground that the decedent had assumed the risk of the injury as a matter of law, and, in an unreported opinion, the Court of Special Appeals affirmed on that ground. We issued the writ of certiorari, *Imbraguglio v. Great Atl. & Pac. Tea Co.*, 356 Md. 16, 736 A.2d 1064 (1999), primarily to address some fundamental misconceptions in the arguments of the parties concerning the summary judgment process. As to the merits, we shall reverse.

The decedent, Salvatore Imbraguglio (Imbraguglio), was employed by Supermarket Distribution Services, Inc. (SDS) as a supervisor and forklift operator in a grocery warehouse and distribution center where he had worked for thirty-five years. SDS is a wholly owned subsidiary of the Great Atlantic & Pacific Tea Company, Inc. (A & P), one of the Respondents. Imbraguglio's fatal fall occurred in a warehouse which was owned by A & P but managed by the other respondent, Super Fresh Food Markets of Maryland, Inc. (Super Fresh), also a wholly owned subsidiary of A & P.

The petitioner and plaintiff is Ethel Imbraguglio, individually and as personal representative of the Estate of Imbraguglio (Petitioner). This case is a third-party action to the workers' compensation claim which has been resolved. In *Great Atlantic & Pacific Tea Co. v. Imbraguglio*, 346 Md. 573, 697 A.2d 885 (1997), we held that A & P, which is the workers'

compensation self-insurer for its subsidiaries, did not enjoy a defense on that basis to this third-party action and that the record did not establish as a matter of law that Super Fresh was the statutory employer of Imbraguglio under Maryland Code (1991), § 9–508 of the Labor and Employment Article. A summary judgment which had been entered in favor of A & P and Super Fresh (Respondents) was reversed in that earlier appeal, and the action was remanded.

Respondents again moved for summary judgment, contending that Imbraguglio had assumed the risk of injury. The circuit court granted that motion for the reasons advanced by Respondents. As we shall see, *infra*, the memoranda submitted to the circuit court in support of, and in opposition to, summary judgment did not present the evidence most favorable to the party opposing summary judgment as that evidence appeared in Respondents' supporting materials.

The facts that are undisputed are that the warehouse where Imbraguglio worked was very large, containing as many as sixty aisles. Supermarket grocery-department products were moved and stored in the warehouse in their transportation cartons on forklift pallets. Loaded pallets were stored in or on racks that formed the aisles in which forklifts operated. Those racks were vertically and horizontally divided into sections, each of which was the storage receptacle or bin for one loaded pallet. These bins were tiered to a height of at least three bins and were largely open. In addition to the aisle side or face of a bin being open, it appears that there were no solid barriers and no closely spaced, intermittent barriers between bins that adjoined vertically or horizontally, at least in the section of the warehouse with which we are concerned.

Thus, it was possible and, one may infer, not an infrequent occurrence, for one or more cartons of product to become "mispositioned," either by having fallen off of a pallet into a bin on one or another side of the intended storage bin, or by having fallen to a level below that of the intended storage bin. Cartons could fall from a pallet when, for example, loaded

pallets were being inserted into or withdrawn from a particular bin. Although the allegations of primary negligence in Petitioner's amended complaint are vague, at least one theory of liability suggested by Petitioner's argument is that the Respondents, as owner and manager of the warehouse, failed to furnish a safe place to work by, *inter alia,* failing to supply bins with barriers that would prevent cartons from becoming mispositioned.

Part of the duties of a warehouse worker such as Imbraguglio was to place in the proper position a product that had become mispositioned. When the mispositioned product was in a bin other than at ground level a worker would reach the higher elevation by a procedure that required two workers. A forklift with an empty pallet placed upon the forks was positioned in front of the column of bins where the task was to be performed. One worker would stand on the pallet while a second worker operated the controls of the stationary forklift in order to raise the pallet to the desired elevation. It was also necessary for the warehouse workers to be raised in this fashion when taking inventory.

Respondents [1] had caused some number of the ordinary pallets to be modified by erecting a post at each corner and by affixing a railing between the posts. Respondents call these modified pallets "cages." The evidence on behalf of Respondents is that warehouse workers who were repositioning stock or taking inventory were required by management to, and so far as management knew, universally did, use cages when the workers were elevated by forklift.[2]

---

**1.** The parties have not taken any pains to distinguish between Respondents in presenting this certiorari review, and we shall not undertake to do otherwise. Precisely which, if either, Respondent breached a duty, if any, owed to Imbraguglio is immaterial to the assumption of risk defense on which Respondents' motion for summary judgment was predicated.

**2.** There was also some evidence from Respondents that a worker, when elevated on a forklift, was also to use a harness. At argument in this Court Respondents acknowledged that the harness was to be attached to the cage. Consequently, the harness does not present an alternative

On the other hand, evidence on behalf of Petitioner, derived from the report of the Maryland Occupational Safety and Health Act (MOSHA) inspectors, is that the warehouse workers did not regularly use cages and that the storage area for the cages was "at the far end of the warehouse which was not an area" where they could be "easily retrieved by the employees for use." Instead, the warehouse workers used pallets that had not been modified into cages. Imbraguglio fell to his death after he had been elevated on an unmodified pallet.[3]

We also learn from the MOSHA inspectors' report that Imbraguglio's fall was caused by his having lost his balance due to a shift of position by at least one of the cartons in the bin where he was working. The inference most favorable to Petitioner is that the shift took place among the product that remained in the bin and that it was not a shift in weight of a carton that Imbraguglio was then handling.

Respondents' position on summary judgment is that Imbraguglio voluntarily chose to use an unguarded pallet when the alternative of using a cage was available to him and that, by this voluntary choice, Imbraguglio assumed the risk of falling. The director of warehousing for SDS acknowledged on deposition that the cages did not comply with the Federal Occupational Safety and Health Act requirements, but the particulars of that noncompliance are not developed in the record. From this unspecific noncompliance Petitioner argues that use of a cage was not a safe alternative.

I

Initially, we need to determine the record that may properly be considered on this summary judgment motion. In support of their motion Respondents submitted four items of evidence.

---

way of performing the repositioning operation, and we do not consider it further on the assumption of risk issue that is before us.

**3.** Respondents assert that the report of the MOSHA investigation is irrelevant and should not be considered. As explained below, we find that the facts reported are relevant to our ground of decision.

The first is a typewritten and signed, but unsworn, statement by David Alonzo Williams (Williams) that was given to a representative of Respondents. Williams was the co-worker who was operating the forklift controls when Imbraguglio was elevated on the pallet. The second item is the transcript of the testimony given before the Maryland Workers' Compensation Commission (the Commission) by Jeffrey Kidd (Kidd), a witness called by SDS in defense of the Petitioner's workers' compensation claim. Kidd was employed by Super Fresh as the grocery warehouse manager. Excerpts from the deposition of Walter L. Swift (Swift), who was described in Respondents' motion papers as the maintenance supervisor at SDS, form the third item of evidence. The fourth consists of excerpts from the deposition of Gary Farmer (Farmer), the director of warehousing for SDS. Petitioner's principal evidence is the report of the MOSHA inspectors. The first issues before us are raised by Petitioner's contentions that Kidd's testimony and Williams's statement should not be considered. Petitioner makes no objection to the deposition testimony of Swift or Farmer, or to any part thereof.

## A

■ Petitioner argues that the circuit court ought not to have considered the statement of Williams because, on summary judgment, the court could only consider evidence that would be admissible at trial and the statement, sworn or unsworn, could not be admissible at trial. Respondents advance four reasons, none of them availing, why the statement was properly considered. First, Respondents say that the matters of fact contained in the statement would be admissible in evidence at trial and, thus, may be considered on summary judgment. But the facts contained in the statement would not be admissible at trial if presented in the form of the statement; ordinarily Williams would have to testify in person or, under certain circumstances, by deposition, for his evidence to be admitted at trial. At the summary judgment stage the court, under the circumstances here, could not consider the statement absent an affidavit from Williams in which he

asserted, *inter alia,* his personal knowledge of the facts contained in the statement or in which he otherwise demonstrated the admissibility through him at trial of testimony as to those facts.

Use on summary judgment of an unsworn statement of a party opponent was attempted in *Diffendal v. Kash & Karry Service Corp.,* 74 Md.App. 170, 536 A.2d 1175 (1988). In that case the court rejected an unsworn statement of the plaintiff who, while looking at items displayed in a supermarket, had fallen over an "L-bed" cart that had been left in the aisle. Asserting that the plaintiff had been contributorily negligent, the defendant moved for summary judgment and supported the motion with a paper, purporting to be a verbatim transcript of a recorded conversation between the plaintiff and, apparently, an adjuster for the defendant's insurer. In that "transcript" the plaintiff admitted that, before she fell, she had seen the L-bed cart near her in the supermarket aisle. The store argued that this statement constituted an admission that the trial court properly had considered in granting the store's motion. Rejecting this argument, the Court of Special Appeals concluded:

> "Mrs. Diffendal's comment that she had seen the L-cart prior to her fall was not in response to a formal admission of fact under Rule 2–424.... The transcript does not represent on its face that the conversation was under oath, and appellee has not made that claim. Additionally, no affidavit has been made ... part of the record, claiming, under oath, that [she] engaged in a conversation ... or that the recorded statement is an accurate transcription of such a conversation."

*Id.* at 181, 536 A.2d at 1181.

The court then quoted P.V. Niemeyer & L.M. Richards, *Maryland Rules Commentary* 252 (1984). In the more recent edition of that work the authors continue to make plain that

> "[a] document can be made part of the motion [for summary judgment] only through affidavit, deposition, or an-

swers to interrogatories that adequately lay the proper foundation for the document's admission into evidence. Authenticity and relevancy of the document must be shown. Attaching documents to a motion for summary judgment without the necessary affidavit is no more acceptable than standing up in open court and attempting to offer the same documents into evidence without a witness or a stipulation." P.V. Niemeyer & L.M. Schuett, *Maryland Rules Commentary* 332 (2d ed.1992) (citation omitted). *See also Vanhook v. Merchants Mut. Ins. Co.*, 22 Md.App. 22, 26–27, 321 A.2d 540, 542–43 (1974) (listing "[s]ome of the ways" to place facts before the court on summary judgment to be affidavits, depositions, answers to interrogatories, admissions of fact, stipulations or concessions and, under some circumstances, pleadings). The unsworn statement of a witness is not, as Respondents contend, an unlisted, but appropriate, form of placing evidence before the court over objection.

■ Respondents also argue that no affidavit from Williams is required because the summary judgment rule states that "[t]he motion shall be supported by affidavit if filed before the day on which the adverse party's initial pleading or motion is filed." Md. Rule 2–501(a). Respondents conclude that, inasmuch as this action was at issue when their summary judgment motion was filed, no affidavit from Williams was required. The purpose of the "affidavit" requirement at that early stage is to place facts before the court where, otherwise, there would be no record. It does not follow, however, from the affirmative statement of the requirement in Rule 2–501(a) that an affidavit is never required, under general summary judgment practice, in stages of the action that fall outside of the period described in the sentence quoted from Rule 2–501(a).

■ The next reason assigned by Respondents for considering Williams's unsworn statement is that it was attached to Respondents' answers to interrogatories. From a procedural standpoint, Respondents' answers to interrogatories were not part of the record in the circuit court. See Rule 2–

401(d)(2) (discovery material ordinarily is not to be filed with the court). The fact that Respondents have included the answers to interrogatories as an appendix to their brief in this Court does not render the answers part of the official record. From a substantive standpoint Respondents' argument also fails because a party cannot convert hearsay material into evidence admissible at trial by the simple expedient of furnishing the hearsay material to the adversary in discovery.

■ Finally, Respondents say that the Petitioner waived objection to considering Williams's statement on summary judgment because the document's "essential contents were made part of the record in the depositions of" Swift and Farmer without objection at those depositions. The defect in Williams's statement, for use on summary judgment, is the lack of an affidavit. This defect is unrelated to use of the statement to examine other potential witnesses on deposition. Further, Petitioner was relieved of any requirement to object at deposition by Rule 2–415(g) ("An objection to the competency of a witness or to the competency, relevancy, or materiality of testimony is not waived by failure to make it before or during a deposition unless the ground of the objection is one that might have been obviated or removed if presented at that time."). At the Swift and Farmer discovery depositions, Respondents could not cure the hearsay character of the factual material in Williams's statement, in that form, by examining the deponents who had no personal knowledge of that factual matter.

We hold that the Williams statement was not part of the record properly considered on summary judgment.

### B

Petitioner also maintains that the testimony of Kidd, given under oath before the Commission, ought not to have been considered in granting summary judgment. In this Court, Petitioner argues that the testimony was inadmissible because it failed to comply with Maryland Rule 2–311 ("Motions"), § (d) which reads: "A motion or a response to a motion that is based on facts not contained in the record or papers on file in

the proceeding shall be supported by affidavit and accompanied by any papers on which it is based." The argument seems to be that Respondents were required to present an affidavit of Kidd containing the substance of this testimony because an asserted difference in the issues before the Commission and those before the circuit court precluded the introduction of the earlier testimony.[4] Petitioner does not contend that Kidd's testimony is irrelevant, and, as we shall demonstrate, *infra*, we find it to be highly relevant.

*At trial*, a transcript of Kidd's former testimony, if offered by Respondents, would be inadmissible over objection unless Respondents could show that Kidd was unavailable within the meaning of Rule 5–804(a), and that the Petitioner had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" in the workers' compensation proceeding. *See* Rule 5–804(b)(1).[5] The argument, however, confuses the requirements for admitting evidence at trial with the requirement, in the summary judgment context, that the movant "plac[e] before the court facts which would be admissible in evidence." *Vanhook*, 22 Md.App. at 26, 321 A.2d at 542.[6]

---

4. The defenses raised by SDS before the Commission do not appear in the record in this case. The record does reflect that, at the conclusion of the employer's presentation, counsel for SDS said: "Your Honor, the cases that we're relying upon deal with the same type of situation where the decedent is in charge of his own activity and that's basically the argument we make."

5. At no stage in this case, including the present stage before this Court, has Petitioner cited Maryland Rule of Evidence 5–804(b)(1). This subsection, which applies only when the declarant is unavailable, states that the following is excluded from the hearsay rule and hence admissible:

    "Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

6. Cf. *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 439–44, 601 A.2d 633, 642–45 (1992) (setting forth the requirements for the use at trial of

■■ The distinction between summary judgment and trial becomes apparent by considering the different functions of an affidavit in each context. An affidavit suffices in the summary judgment context to place before the court a fact that, *if* testified to by the affiant at trial, would be admissible, even though the affidavit itself generally is not admissible at trial. The court can reasonably assume that, if called as a witness at trial, the affiant would testify to the same facts as those set forth in the affidavit. Thus, the trial judge may consider the affidavit in the summary judgment context even though, at trial, the affidavit itself generally would be inadmissible and the affiant would have to testify.

■ A transcript of former testimony possesses the same indicia of reliability as an affidavit in the summary judgment context. The transcript indicates the matters to which the witness, *if* called in the present case, would testify, because, like an affiant, the witness gave the former testimony under oath. By a parity of reasoning, the court on summary judgment may consider the transcript of the former testimony even though, at trial, the transcript itself might not be admissible under Rule 5–804(b)(1).

Although it appears that no Maryland court has addressed specifically this issue in the summary judgment context, the Court of Special Appeals has held that testimony from a previous trial may be attached as an exhibit to a response to a motion for summary judgment filed in the same case upon remand. *See Casey v. Grossman,* 123 Md.App. 751, 758, 720 A.2d 959, 962 (1998), *cert. denied,* 353 Md. 269, 725 A.2d 1068 (1999).[7] Other courts addressing this issue also have decided

depositions from previous cases to which the opponent of such evidence was not a party).

**7.** This lead paint case was the later of two appeals, *Bartholomee v. Casey,* 103 Md.App. 34, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995) (*Casey I* ), and *Casey v. Grossman, supra* (*Casey II* ). *Casey I* reversed a jury verdict in favor of the plaintiff on the ground that the trial court abused its discretion by admitting testimony, offered on behalf of the plaintiff, concerning abatement methods and

that a trial judge, when ruling on a motion for summary judgment, properly may consider a transcript of former testimony because the transcript has the sort of reliability just noted.[8] Although some courts have decided otherwise, those

---

post-abatement conditions of the premises, when that evidence was inconsistent with the plaintiffs' affirmative statements in their answers to interrogatories, and when they did not file any supplemental answers. *Casey I*, 103 Md.App. at 48–51, 651 A.2d at 914–16. That court also stated, however, that its "determination [concerning the improperly admitted testimony] . . . does not necessarily preclude admission of the evidence at any retrial, for [the defendant] could no longer claim surprise or prejudice." *Id.* at 51, 651 A.2d at 915–16. The court then remanded the case in light of the Court of Appeals' holdings in more recently decided lead paint cases.

On remand, the defendant moved for summary judgment on the ground that the plaintiff had failed to prove causation. *Casey II*, 123 Md.App. at 755, 720 A.2d at 961. In response to this motion, the plaintiff attached the testimony concerning the post-abatement conditions that the *Casey I* court had determined inadmissible. *Casey II* held that the trial court erred in granting summary judgment for reasons unrelated to the attachment of this testimony. In so holding, however, that court stated that "the testimony should have been considered in deciding the issue of summary judgment." *Id.* at 758, 720 A.2d at 962. *Casey II* did not address the issues of any difference in issues between the first trial and the trial upon remand, or the adequacy of authentication.

8. *See, e.g., United States v. O'Connell*, 890 F.2d 563, 567 (1st Cir.1989) (asserting, in civil trial of corporation for defrauding government, that trial court properly considered on summary judgment testimony from previous criminal trial of corporation's one-third owner because " '[a]ll of the hallmarks of reliability attend upon such transcripts,' " and because they contain " 'sworn testimony faithfully recorded during the conduct of a judicially-supervised adversarial proceeding' ") (quoting *Advance Fin. Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 27 (1st Cir.1984)); *Advance Fin. Corp.*, 747 F.2d at 27 ("If a party, for summary judgment purposes, may rely on affidavits . . . and if depositions and answers to interrogatories may be considered, there is no sensible rationale which would preclude reliance on sworn testimony faithfully recorded during the conduct of a judicially supervised adversarial hearing.") (citations omitted); *Bradley v. Associates Discount Corp.*, 67 So.2d 913, 915 (Fla.1953) ("We have the view that pertinent excerpts from the transcription of the testimony introduced in the first trial was easily as dependable for the purpose of testing the motion [for summary judgment] as depositions, admissions and affidavits would have been and that, therefore, the court committed no error in considering it for that purpose."); *Tye v. Board of Educ.*, 44 Ohio App.3d 76, 541 N.E.2d 466, 468, 469 (1988) (holding that state trial court, in deciding plaintiff's summary judgment motion in suit to compel arbitration, properly

cases appear to involve the use of trial or deposition testimony from a previous case to which the plaintiff or defendant against whom the evidence presently is offered was not a party.[9] The latter holdings do not apply here, where Petitioner was a party to the workers' compensation proceeding at which Kidd testified. Consequently, we indicate no opinion on whether the latter holdings have any vitality in Maryland.

■■■ The transcript of Kidd's testimony before the Commission reliably indicated the matters to which he would testify at trial, and the trial court properly considered this transcript when ruling on Respondents' motion for summary judgment.

## II

From the record, properly constituted, we must now determine the facts most favorable to Petitioner, as the party opposing summary judgment. Further, inasmuch as the only issue is whether Imbraguglio assumed the risk of injury as a

---

considered a transcript from her separate federal Title VII action against the same defendants because the "transcribed testimony meets the criterion of reliability as it is sworn testimony in a courtroom hearing at which the [defendants] were represented by counsel"); *State Bar v. Erskine*, 954 S.W.2d 868, 871 (Tex.Ct.App.1997) (holding that the trial court, in granting summary judgment in favor of attorney in disciplinary action against him, properly considered transcript of testimony of complaining witness at a previous grievance hearing, because the transcript was adequately authenticated); *see also* 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2722, at 373 (3d ed.1998) (noting that "depositions taken for purposes of another case also may be utilized" in the summary judgment context).

9. *See Copeland v. Samford Univ.*, 686 So.2d 190, 195 (Ala.1996) (refusing to adopt the rule that "testimony from previous adversarial proceedings should be admitted for consideration on motions for summary judgment" because, in wrongful death action against university, the latter was not a party to the previous criminal trial of professor who had killed student); *Gatton v. A.P. Green Servs., Inc.*, 64 Cal.App.4th 688, 75 Cal.Rptr.2d 523, 526 (1998) (upholding trial court's refusal to consider deposition testimony from two previous cases, neither involving defendant, because defendant succeeded under statutorily provided "admissibility objections" in showing that the record "fail[ed] to satisfy either the unavailability or interest-and-motive requirement").

matter of law, our concern is only with the facts most favorable to the Petitioner on that issue. The parties have consistently argued the summary judgment motion, and the courts below have treated the record, as if the evidence most favorable to the Petitioner was that Imbraguglio fell from a height of fourteen feet. That is not what the record reflects.

In his deposition Farmer said, "I can tell you exactly what happened." Farmer's version of the accident seems to be part personal observation of the scene, part opinion based on experience, and part hearsay based on what Williams told Farmer. Nevertheless, Respondents offered Farmer's evidence without objection.

Farmer said:

"[Imbraguglio] was running a let-down fork. He was going to retrieve a pallet of tissue. And, when he did, he dropped probably three or four cases off that pallet of 15. And, so, he brought down the rest of them [which] had stayed on the pallet. Then he went up to get his other three or four cases."

When asked about his report that Imbraguglio had fallen approximately fourteen feet to the floor, Farmer said, "Oh, that was a guesstimate." The "guesstimate" was calculated as follows, according to Farmer:

"[T]he pallet [*i.e.*, bin] heights that [Imbraguglio] was at . . . were six foot heights, to the level that the bar that he was at would have been about a 12 and a half foot high, lifted up area, would have been lifted, probably waist high. So, his head from the floor was probably about 14 feet."

The record does not reflect how tall Imbraguglio was. Nevertheless, it is clear that the fourteen foot measurement is not the elevation of the pallet platform above the floor, but an estimate of the distance from the floor to the top of Imbraguglio's head. Furthermore, a trier of fact could interpret this testimony to mean that Imbraguglio was attempting to retrieve the dropped cartons from the second tier of bins, but we do not know how high within a six foot tall bin the product was mispositioned. If we assume, as did Farmer, that Imbragug-

lio was attempting to position the pallet on the forklift so that his waist would be approximately parallel to the top of the mispositioned cartons in the second tier, which resulted in the top of Imbraguglio's head being fourteen feet above the floor, the pallet on which Imbraguglio was standing would have been less than ten feet above the floor, unless Imbraguglio was less than four feet tall.

The evidence bearing on the elevation of the unprotected pallet that is most favorable to Petitioner is found in Kidd's testimony. Kidd testified as follows:

"[Williams] was stopped by [Imbraguglio] and asked to raise [Imbraguglio] up to the *second* level to fix some cases that had become 'mis-positioned' in the rack. [Imbraguglio] had already gotten an *empty* pallet and positioned the forklift. He stood on the [pallet placed upon the] forklift and [Williams] raised him up to approximately *six to seven feet. The pallet itself was between six and seven feet off the floor.* The pallet was still in the same position when I got over there after the accident had happened. I asked [Williams]—I said, 'Is that where the pallet was when [Imbraguglio] fell?' He said, 'Yeah. I haven't touched anything.' "

(Emphasis added).[10]

The circuit court properly could have considered the above-quoted evidence. The Kidd testimony was presented by Respondents, and Petitioner's reasons for objecting thereto were not well taken. Further, even if Williams's statement to Kidd, as presented by Kidd in his testimony, should be excluded from consideration, it is nevertheless clear that Kidd arrived on the scene promptly after the accident and personally observed the height to which the forks were then elevated.

---

**10.** In Respondents' memorandum in support of summary judgment they represented to the court that "Mr. Kidd testified that on April 21, 1992, the decedent requested a fellow employee to lift him to a height of approximately thirteen (13) to fourteen (14) feet above the ground." Respondents further stated to the circuit court that "[a]ccording to Mr. Farmer, Mr. Imbraguglio was lifted to a height of approximately 14 feet in order to complete this undertaking."

From this a trier of fact properly could infer that the platform was less than seven feet above the floor when Imbraguglio fell. Common human experience indicates that Williams's first concern would have been to get help for Imbraguglio and not to play with the elevation controls on the forklift.

The height to which the platform was elevated is a material factor under the law of assumption of risk and by reference to OSHA safety regulations, as we explain below.

### III

"Assumption of the risk is a defense applicable to negligence claims." *JBG/Twinbrook Metro Ltd. Partnership v. Wheeler*, 346 Md. 601, 619, 697 A.2d 898, 907 (1997). The defendant must specially plead assumption of risk under Maryland Rule 2–323(g)(3), and the defendant bears the burden of proof. *See ADM Partnership v. Martin*, 348 Md. 84, 90–91, 702 A.2d 730, 734 (1997). Specifically, "the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *Id.* (citing *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 630, 495 A.2d 838, 843 (1985)).

As the reasoned justification for this defense, this Court has stated that "[t]he doctrine of assumption of risk rests upon an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward him and to take his chances from harm from a particular risk." *Rogers v. Frush*, 257 Md. 233, 243, 262 A.2d 549, 554 (1970). W.P. Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 489 (Lawyer's 5th ed.1984), state that "[i]n the usual case, [the plaintiff's] knowledge and appreciation of the danger will be a question for the jury; but where it is clear that any person in his position must have understood the danger, the issue may be decided by the court." (Footnote omitted).

According to Respondents, Imbraguglio is deemed to have known and appreciated the risk under *Martin*. Citing *Schroyer v. McNeal*, 323 Md. 275, 592 A.2d 1119 (1991),

*Gibson v. Beaver,* 245 Md. 418, 226 A.2d 273 (1967), and *Evans v. Johns Hopkins University,* 224 Md. 234, 167 A.2d 591 (1961), this Court stated in *Martin:*

" 'In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him.' *Gibson,* 245 Md. at 421, 226 A.2d at 275. Thus, 'when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court.' *Schroyer,* 323 Md. at 283–84, 592 A.2d at 1123; *see also Gibson,* 245 Md. at 421, 226 A.2d at 275 (quoting W. Prosser, *Handbook of the Law of Torts,* § 55, at 310 (2d ed. [1955] )); *Evans,* 224 Md. at 238–39, 167 A.2d 591. Moreover, 'there are certain risks which anyone of adult age must be taken to appreciate: the danger of slipping on ice, of falling through unguarded openings, of lifting heavy objects . . . and doubtless many others.' *Prosser and Keeton* § 68, at 488."

*Martin,* 348 Md. at 91–92, 702 A.2d at 734. Respondents emphasize "falling through unguarded openings," when arguing that Imbraguglio knew and appreciated the risk of his injury. The question here, however, is whether Imbraguglio assumed the risk as a matter of law.

 Petitioner focuses her attack on the summary judgment at the third element of assumption of risk, voluntariness. She points to the evidence that the "cages" were not OSHA compliant, a fact that is not further explained in the record. From this Petitioner concludes that there was no choice because either type of platform—an unguarded pallet or a modified pallet referred to by Respondents as a cage—was dangerous. That conclusion by no means follows from the present state of the record. Further, Imbraguglio's decision to use a pallet without a guardrail was a voluntary act. The fact that it was more convenient for him to use the unguarded pallet does not make his action non-voluntary. *See Brady v. Ralph M. Parsons Co.,* 327 Md. 275, 289–90, 294, 609 A.2d 297, 304, 306 (1992) (affirming jury verdict that employee assumed

risk, and noting that he may have decided not to perform the task in a safer manner "because his [own] method was somewhat faster and 'easier,'" and that proof of an OSHA violation does not preclude consideration of this defense); *Schroyer,* 323 Md. at 288–89, 592 A.2d at 1125–26 (holding that hotel guest assumed the risk as a matter of law when she chose to park on and walk across ice-covered portion of parking lot "for her own purposes, *i.e.,* her convenience in unloading her belongings").

Our conclusion as to the voluntariness of Imbraguglio's decision, however, is not the end of the matter. It simply illuminates the issue. Here, a trier of fact could infer that the immediate cause of Imbraguglio's fall was the shift of a carton in the bin from which Imbraguglio was retrieving part of an order that he had been filling which had fallen off the storage pallet. Thus, the issue is whether Imbraguglio assumed the risk of injury or death from a fall caused by a shift in bin content, while he was standing on an unguarded pallet between six and seven feet from the floor, when that fall might or might not have been prevented by a pallet with a single course railing.

Some of our cases have involved falls from heights. Most recently, *Brady, supra,* dealt with a worker who stepped from an unguarded scaffold onto a wall from which he fell forty feet to his death. We held that there was sufficient evidence for a jury to find assumption of risk. There was a difference of thirty-five feet in the drop on one side of the wall as compared with the other. Focusing on the greater drop, we said:

"Although a fall from that wall to the east . . . would have involved a distance of only about five feet, a fall to the west meant a drop of approximately 40 feet to the ground below. The risk was immediately apparent, and the evidence was sufficient to support a finding that [the decedent] knew of the existence of the risk and appreciated its unreasonable character."

327 Md. at 288, 609 A.2d at 303. It was unnecessary in *Brady* to determine whether the decedent had assumed the risk as a

matter of law, inasmuch as the jury returned a defendant's verdict.

In *Kasten Construction Co. v. Evans,* 260 Md. 536, 273 A.2d 90 (1971), a worker was injured when the telephone pole that he had climbed toppled to the ground. The pole was thirty feet long but remained only two feet into the ground after the defendant had excavated three feet of the earth in which the pole had been erected. The worker, who was wearing a safety belt, was at the top of the pole, pulling on an electric line in order to make a connection when the pole fell. The defendant argued for assumption of risk as a matter of law. This Court said that the plaintiff "assumed no risk in merely climbing the pole." *Id.* at 544, 273 A.2d at 94. Further, we said that "[i]t would be putting it too high, we think, to say that, as a matter of law, [the plaintiff] knew, understood and appreciated the likelihood or possibility that a third pull [on the electric line to be connected] would cause the pole to break out of the ground and that he voluntarily assumed that risk." *Id.* at 545, 273 A.2d at 94.

The plaintiff in *Hilton Quarries, Inc. v. Hall,* 161 Md. 518, 158 A. 19 (1932), was standing on the cab of his truck at the defendant's quarry where the truck was being loaded with a box of stone that was lowered from a boom affixed to a derrick. The load suddenly dropped knocking the plaintiff from the cab roof to the ground where he was further injured by debris. In holding that the plaintiff had not assumed the risk of injury as a matter of law this Court said:

"Defenses of assumption by the plaintiff of the risk of injury, and of contributory negligence on his part, which are much relied on in the case, both refer to the effect of his taking the position on the top of the cab of his truck, and are two aspects of the same contention: That in taking that position he, of his own volition, put himself within the dangers from which his injury resulted; and, having done so, cannot recover for the injury as brought upon him by a wrong of the defendant. In so far as it is contended that, merely by consciously taking the more dangerous of two possible positions, a visitor assumes the risk of injury in

that position from any cause, this court disagrees, because the visitor might properly regard the position as attended with some dangers, yet not those from which injury comes to him, and might rightly be satisfied of his ability to cope with the former dangers, yet be justified in ignoring the other possible but unexpected dangers. He might be held bound to anticipate and so to assume dangers from operation in ordinary course, yet not to anticipate and assume the risk of rare casualties such as the derrick operator has described in this case, unless he occupies his position without the permission and contrary to the directions of the proprietor of the premises and the work. And in that connection, the evidence of the quarryman of his warnings and orders to the truck driver are to be considered."

*Id.* at 523–24, 158 A. at 20–21. Obviously, if voluntarily choosing to stand on the roof of the truck, instead of choosing the alternative of a ground level position, was assumption of risk as a matter of law, there would have been no need for the Court to discuss the evidence about warnings and about the actual cause of the plaintiff's fall.

Here, the shifting of content in the second tier bin can be analogized to the sudden drop of the box of stone in *Hilton Quarries,* or to the swing in an unexpected direction of a cargo boom with a load of lumber that injured the plaintiff in *Bull Steamship Lines v. Fisher,* 196 Md. 519, 77 A.2d 142 (1950), where assumption of risk was also held to be a jury question. In the latter case we said that

"every risk is not necessarily assumed by one who works in a dangerous place or at a dangerous occupation. He assumes only those risks which might reasonably be expected to exist, and, if by some action of the defendant, an unusual danger arises, that is not assumed. Where there is a dispute whether the risk is assumed or not, that question is usually left to the jury."

*Id.* at 526, 77 A.2d at 146. We cannot determine, on the instant record, whether a shift in the contents of a bin, while a worker is retrieving dropped cartons, is an expected or unex-

pected occurrence. Respondents have failed to meet their burden of producing evidence on that point.

The principle governing the issue before us is stated in Restatement (Second) of Torts § 496D (1965), dealing with "Knowledge and Appreciation of Risk," and reading:

> "Except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character."

Comment *b* further explains as follows:

> "The basis of assumption of risk is the plaintiff's consent to accept the risk and look out for himself. Therefore he will not be found, in the absence of an express agreement which is clearly so to be construed, to assume any risk unless he has knowledge of its existence. This means that he must not only be aware of the facts which create the danger, but must also appreciate the danger itself and the nature, character, and extent which make it unreasonable. Thus the condition of premises upon which he enters may be quite apparent to him, but the danger arising from the condition may be neither known nor apparent, or, if known or apparent at all, it may appear to him to be so slight as to be negligible. In such a case the plaintiff does not assume the risk. His failure to exercise due care either to discover or to understand the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence."

On the present record, a trier of fact could find that the risk of shifting bin contents would appear negligible to a worker in Imbraguglio's position.

Respondents have presented their defense by emphasizing the absence of a guardrail on the pallet that Imbraguglio chose to use. They view the risk to be the risk of falling, without regard to the immediate cause of the fall. Although Imbraguglio possessed knowledge, as a matter of law, of the possibility of falling from the unguarded elevated pallet, because that danger was self-evident, the element of "apprecia-

tion" is less clear. In a case of the instant type, an important factor in the objective evaluation of appreciation of a plaintiff's risk, *i.e.*, of the nature and magnitude of the potential injury, is the height at which the plaintiff was working without a guardrail. In the workplace context considerable guidance on the degree to which Imbraguglio is charged with appreciation of the risk can be gleaned from OSHA safety regulations.

The OSHA regulation dealing with the use of forklifts is 29 C.F.R. § 1910.178 titled "Powered industrial trucks." The only section of that regulation that relates to circumstances possibly analogous to those before us is § 1910.178(m)(12), which reads:

"Whenever a truck is equipped with vertical only, or vertical and horizontal controls elevatable with the lifting carriage or forks for lifting personnel, the following additional precautions shall be taken for the protection of personnel being elevated.

"(i) Use of a safety platform firmly secured to the lifting carriage and/or forks.

"(ii) Means shall be provided whereby personnel on the platform can shut off power to the truck.

"(iii) Such protection from falling objects as indicated necessary by the operating conditions shall be provided."

Subsection (m)(12) concerns itself with protecting persons who are in the process of being raised or lowered and so does not apply to the instant case.

This reading is consistent with the decision and order of the Occupational Safety and Health Review Commission (the Agency) in *Secretary of Labor v. Seward Motor Freight, Inc.*, 1987 OSHD (CCH) ¶ 28085, *full text available in* 1987 WL 245514. There, employees who were repairing over-the-highway semi-trailers were required to work on the roofs which were approximately thirteen feet above the ground. To work at that level some employees stood on a wooden platform affixed to the forks of a forklift but, unlike the procedure in the instant matter, elevating the platform was a one person operation. The worker first would elevate the platform to the

desired height, then climb to the top of the roll cage of the forklift, and then climb the extended mast of the forklift to the work platform. One of the workers was seriously injured when he fell while descending from the platform in the reverse of the described procedure. Significant to the case before us is the Agency's conclusion that the violations of § 1910.178(m)(12) were failing to have an operator at the control position in the forklift and failing to have controls on the platform.[11] Here, Imbraguglio had already reached the desired elevation of six to seven feet, and was working from the stationary platform when he fell.

On the other hand, if 29 C.F.R. § 1910.178(m)(12) means that only a powered industrial truck equipped with controls elevatable with the lifting carriage may be used for lifting personnel, then Imbraguglio could not have voluntarily rejected using it because that type of industrial powered truck was not available to him. Thus, the issue before us remains the same, that is, whether Imbraguglio assumed the risk as a matter of law by choosing the unguarded pallet versus the pallet with a guardrail.

Once Imbraguglio had been lifted six to seven feet off the ground he was using the pallet, for all practical purposes, as a scaffold. Scaffolds are one of the subjects addressed in Part 1910 of the OSHA standards, 29 C.F.R., subpart D, "Walking-

---

11. Specifically, the Agency said:
    "That the hazard attendant upon using such a platform-rigged fork lift was recognized by users of powered industrial trucks, which include such equipment, is established by the American National Standards Institute (ANSI), Safety Standard for Powered Industrial Trucks. Section 513, of that Standard requires that whenever a 'truck' (here a fork lift) is used to elevate personnel for any reason, there shall be an operator in the control position of the truck for the protection of the person being elevated. Likewise the standard provides that if the platform is equipped with vertical hoisting controls that for the protection of the personnel being elevated the personnel on the platform be provided means of shutting off power to the truck. Here the respondent omitted the industry required precautions of having an operator present at all times while personnel was elevated or of supplying controls on the platform."
    (Citation omitted).

working surfaces," § 1910.28, titled "Safety requirements for scaffolding."

For purposes of § 1910.28, a scaffold is defined as "[a]ny temporary elevated platform and its supporting structure used for supporting workmen or materials or both." § 1910.21(f)(27). Throughout the safety regulations dealing with scaffolds, guardrails are required when the scaffold is more than ten feet above the ground or floor. For example, § 1910.28(b), dealing with requirements for wood pole scaffolds, provides in subsection (15):

"Guardrails not less than 2 × 4 inches or the equivalent and not less than 36 inches or more than 42 inches high, with a mid-rail, when required, of 1 × 4–inch lumber or equivalent, and toeboards, shall be installed at all open sides on all scaffolds more than 10 feet above the ground or floor. Toeboards shall be a minimum of 4 inches in height. Wire mesh shall be installed in accordance with paragraph (a)(17) of this section."

The same ten foot minimum elevation before guardrails are required is found in the regulations as to tube and coupler scaffolds, § 1910.28(c)(14), as to tubular welded frame scaffolds, § 1910.28(d)(7), as to masons' adjustable multiple-point suspension scaffolds, § 1910.28(f)(15), as to two-point suspension scaffolds (swinging scaffolds), § 1910.28(g)(5), as to stone setters' adjustable multiple-point suspension scaffolds, § 1910.28(h)(8), as to carpenters' bracket scaffolds, § 1910.28(k)(5), as to horse scaffolds, § 1910.28(m)(7), and as to plasterers', decorators', and large area scaffolds, § 1910.28(o)(2).

▮▮▮ The same ten foot minimum height before guardrails are required is found in the OSHA regulations dealing with scaffolds in the construction industry. There a scaffold similarly is defined as "any temporary elevated platform (supported or suspended) and its supporting structure . . . used for supporting employees or materials or both." 29 C.F.R. § 1926.450(b). A pallet suspended on a forklift, used to support an employee, fits this definition of a scaffold. Indeed,

the regulations contemplate the use of forklifts to support scaffolds, saying, "Fork-lifts shall not be used to support scaffold platforms *unless* the entire platform is attached to the fork and the fork-lift is not moved horizontally while the platform is occupied." 29 C.F.R. § 1926.451(c)(2)(v) (emphasis added). That is how the forklift was being used to support the scaffold in the case before us. As to the risk of falls, the regulations require only that "[e]ach employee on a scaffold more than 10 feet (3.1 m) above a lower level shall be protected from falling to that lower level." 29 C.F.R. § 1926.451(g)(1).[12]

## IV

■ To summarize, the principal relevant circumstances, construed most favorably to Petitioner as the non-moving party on summary judgment, are these. Imbraguglio had worked at the warehouse for about thirty-five years. Workers there were required to be elevated by forklift to align or count inventory. Workers there regularly did not use cages when being so elevated, despite a management rule requiring cages, and, instead, the workers used pallets without guardrails. The immediate cause of Imbraguglio's falling was a shifting in the content of a bin, an event that may or may not have been expected to occur. A trier of fact further could find that Imbraguglio fell from a height of six or seven feet while the pallet and forklift were stationary and while Imbraguglio was using the platform as a scaffold. Reference to OSHA regulations dealing with scaffolding indicates that a guardrail is not required at elevations of ten feet or less (measured from the scaffold platform to the floor or ground, and not from the top of the worker's head to the floor or ground). Triers of fact might or might not find that a worker in Imbraguglio's position, by choosing an unguarded pallet on which to work, so appreciated the risk of falling, or of being caused to fall, from

---

12. We also note that the regulations dealing with working on a stationary platform or scaffold that is less than ten feet above the ground do not contain any requirement for a harness.

a height of six to seven feet, that the worker in effect consented to relieve the Respondents of any alleged obligation for the worker's safety, for example, to erect a barrier between bins. Accordingly, we cannot say that Imbraguglio assumed the risk as a matter of law.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMANDING THIS CASE TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.*