751 A.2d 481

**Lee James CREWS**

**v.**

**John HOLLENBACH, Sr., et al.**

**No. 76, Sept. Term, 1999.**

Court of Appeals of Maryland.

May 11, 2000.

628

630

Erik D. Frye, Greenbelt, for Petitioner.

Robert L. Ferguson, Jr. (Ann D. Ware of Ferguson, Schetelich & Heffernan, P.A., Baltimore; Peter J. McNamara of McNamara & Fizer, Baltimore; Thomas J. Davis of Thomas J. Davis & Associates, Rockville; and Norton C. Joerg of McBreen & Kopko, Upper Marlboro, all on brief), for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

A natural gas leak led to an explosion in Bowie, Maryland on 23 March 1996. As a result of the explosion, Lee James Crews, the foreman of a gas line repair team sent to the scene of the gas leak by his employer, Washington Gas Light Company (Washington Gas), was injured seriously. Mr. Crews and his wife, Theresa, (Petitioners) filed a complaint, sounding in negligence and strict liability, in the Circuit Court for Prince George's County seeking damages against numerous parties, Respondents here,[1] claimed to have played roles in causing the gas leak. After ruling that Petitioners were barred from recovery by the principles of the doctrine of assumption of the risk, the Circuit Court granted summary judgment in favor of Respondents. The Court of Special Appeals affirmed.[2] We granted Petitioners' request for a writ of certiorari[3] to consider the following questions posed by Petitioners:

1) Did Petitioner, Lee James Crews, assume the risk of a gas explosion merely by virtue of his occupation?

2) Does Maryland apply the doctrine of primary assumption of the risk to employees of the gas company?

3) Does the doctrine of assumption of the risk apply to this matter?

4) Does the Petitioner benefit from the "rescue doctrine"?

## FACTS

On 23 March 1996, John Hollenbach, Sr. (Hollenbach), an employee of Honcho & Sons, Inc. (Honcho), was excavating land located near 11405 Trillium Lane, Bowie, Maryland. Honcho was a sub-contractor of Excalibur Cable Communica-

---

1. The Respondents to this appeal are: John Hollenbach, Sr., Excalibur Cable Communications, Honcho & Sons, Inc., Maryland Cable Partners, L.P., and Byers Engineering Company.

2. *Crews v. Hollenbach*, 126 Md.App. 609, 730 A.2d 742 (1999).

3. *Crews v. Hollenbach*, 356 Md. 16, 736 A.2d 1064 (1999).

tions (Excalibur). Excalibur was engaged by Maryland Cable Partners, L.P. (Maryland Cable) to carry out a cable installation project. The area that Hollenbach excavated was marked previously by Byers Engineering Company (Byers), pursuant to the "Miss Utility" statute, to facilitate the excavating contractor's avoidance of known buried utility lines.[4]

Despite Byers' markers, Hollenbach struck a buried natural gas line owned by Washington Gas. The strike created a leak in the line. Neither Hollenbach nor anyone at the scene immediately contacted anyone regarding the leak, and natural gas released freely into the air and ground for a period of time. Two hours later, a resident, located approximately one mile from the leak, recognized the smell of gas in the air and notified the fire department. The governmental authorities evacuated the surrounding neighborhood. Washington Gas was contacted and dispatched a repair crew to the scene of the leak. Mr. Crews, a Washington Gas employee for over twenty years, was the foreman in charge of the crew. Upon arrival at the scene, Mr. Crews and his co-employees commenced the process of dissipating the gas that had permeated the ground. While he and his crew were engaged in closing off the leak, the gas ignited and an explosion occurred. Mr. Crews was injured severely. The cause of the spark that ignited the gas was unknown, but no allegation was made that Respondents were the cause of the ignition source.

---

4. The "Miss Utility" statute is now codified in Maryland Code (1998 & 1999 Cum.Supp.), Public Utility Companies §§ 12–101–12–317. The purposes of the "Miss Utility" statute are to protect public service companies and other similarly situated entities from the destruction of their underground facilities and to prevent personal injuries during proposed excavation projects. *See* § 12–102. In general, a person proposing to perform an excavation in Maryland must, at least 48 hours before starting the excavation, provide notice to the owners of underground facilities of its intention to excavate. *See* Public Utility Companies § 12–108. *See also Board of County Comm'rs of Garrett County v. Bell Atlantic–Maryland, Inc.,* 346 Md. 160, 695 A.2d 171 (1997)(containing a complete discussion of the "Miss Utility" statute under former Maryland Code (1991 Repl.Vol.), Article 78, § 28A, and an excavating contractor's duties thereunder).

## PROCEDURAL BACKGROUND

On 1 August 1997, Petitioners filed a twenty-count complaint in the Circuit Court for Prince George's County against Respondents. The causes of action asserted by Mr. Crews ranged from various themes of negligence, including negligent hiring and negligent supervision, to strict liability for the abnormally dangerous activity of Respondents "shooting a hole in the vicinity of utility lines." Mrs. Crews joined her husband in a loss of consortium claim.

Excalibur filed a motion to dismiss on 3 November 1997. In the motion and accompanying memorandum, Excalibur argued that the doctrine of so-called "primary" assumption of the risk barred Petitioners' suit because Mr. Crews's injuries resulted from a risk that was inherent in his employment. Excalibur asserted that Mr. Crews necessarily appreciated the dangerous nature of his occupation and knew, upon arrival at the scene of the gas leak, that he was to confront a hazardous situation. Excalibur reasoned that Mr. Crews "cannot recover for an alleged negligent act for which he was specifically employed to correct." On 19 December 1997, Maryland Cable filed a motion for summary judgment incorporating the legal arguments of Excalibur's motion to dismiss. By order docketed 6 February 1998, the Circuit Court denied Excalibur's motion to dismiss. On 3 March 1998, the Clerk of the Court sent to the parties written notice that a hearing on Maryland Cable's motion for summary judgment would be held on 24 April 1998.

Mr. Crews was deposed by Respondents on 21 April 1998.[5] In the course of the deposition, Respondents initially established that Mr. Crews was not down in the hole repairing the gas leak on 23 March 1996, but rather was standing apparently on the edge of the excavation supervising the members of his crew who were in the hole attempting to repair the leak. Accordingly, Mr. Crews was not wearing a fire retardant hood

---

5. At the time of the hearing before the Circuit Court on 24 April 1998, only a partial transcript of this deposition (ordered by Respondents) was available and offered to the Court.

at the time as he had been trained this was necessary only when one was "in the hole working with the gas." The following exchanges then occurred between Mr. Crews and counsel for Maryland Cable:

Q. Okay. Now, you told us earlier that there was a heavy smell of gas in the area?

A. At that particular area.

Q. Well, you mean in the area that you were working?

A. Yes, yes.

Q. Is there a point that you recognize the gas smell to be so heavy that you know that it's dangerous?

A. Well, we always are taught that any type of gas leak or odor is always dangerous.

Q. All right.

A. And we always try to work it in a safe manner.

Q. Okay. So—

A. And we understood that.

Q. So when you smelled that heavy smell of gas that day on the job, you know that—you knew that the atmosphere was dangerous?

A. Well, yeah. We knew that that area that we was working in could be dangerous.

Q. Okay. And you knew that that danger included the danger that a fire would start, correct?

A. We were aware that fire will start behind natural gas.

\* \* \* \* \*

A. ... But anything can set [the gas] off, [sparks] from gravels or rocks that hit together, hitting metal. That could set it off.

Q. For instance, the metal bucket of your backhoe striking a rock as you were digging—

A. That's correct.

Q. —you knew that that could create a spark?

A. We knew that.

Q. And you knew that if the spark occurs, you could have a fire and an explosion, correct?

A. That's correct, but as I said before, that it have to be worked, regardless. You know what I mean? It have to be repaired.

It's a chance you have to—that we go through. Then again, there's the other exception to the rule, too.

\* \* \* \* \*

Q. You know that there is this risk of fire, correct?

A. That's correct.

Q. But you also know that part of your job is accepting that risk, correct?

\* \* \* \* \*

THE WITNESS: To the circumstances, yes. But on this occasion that it happened, it didn't have to be this way.

Q. What do you mean by that?

A. Because if the person, I'll say, that dug—that did that had moved in the proper procedure their way, I wouldn't have had to have been there to get into this thing.[6] You know what I mean?

Q. Sure. I mean, if nobody ever hit a pipe that then required repair, you might not even have to work for Washington Gas, isn't that true?

A. No.

Q. They wouldn't need you, would they?

A. Well, I don't—I'll say, well, true—yes and no. You know what I mean?

Q. All right. But once something like that has happened, regardless of the reason, once damage has occurred to a gas pipe and you're called out there to make the repair as part

---

6. The reasonable inference drawn from this response, viewed in a light most favorable to Petitioners, is that Mr. Crews was referring to Respondents' assumed primary negligence which created the gas leak that occasioned his presence at the scene on 23 March 1996.

of your job, you know that there is a risk of fire and you know that it's part of your job to accept that risk, correct?

\* \* \* \* \*

THE WITNESS: Yes. I accept that responsibility when we first got hired, but there is a control of gas that we usually deal with.

On 23 April 1998, Excalibur filed a supplemental memorandum in support of a renewed motion to dismiss or alternatively, a motion for summary judgment. In addition to reasserting that Petitioners' claims were barred by "primary" assumption of the risk, Excalibur stated that "[i]t is also undisputed that [Mr. Crews] knew of the risk of fire and explosion on the day that he was working to repair the gas leak, yet he voluntarily encountered the risk. His claim is barred by assumption of risk." From this, it may be inferred that Excalibur also was contending that Petitioners' claims were barred by the conventional doctrine of assumption of the risk as recognized previously in Maryland common law. Excalibur attached to its motion the partial transcript of Mr. Crews's deposition, which included the above quoted exchanges, in support of its motion.

After hearing arguments on 24 April 1998 from the parties regarding the applicability of any theory of assumption of the risk, the trial court granted Excalibur's and Maryland Cable's motions for summary judgment, as well as oral motions for summary judgment submitted by Byers, Honcho, and Hollenbach at the hearing. The judge explained:

> [Mr. Crews] was an expert gas repair technician, and he was sent to the property where the gas leak had occurred for the specific purpose of inspecting and addressing the problem. That was his job. That he knew what he was doing and appreciated the risks associated with doing his job is clear in this case. And that he specifically assumed the risk of his job is also clear ... Accordingly, I see no issue with respect to Mr. Crews going to this jury ...

Invited by Petitioners' counsel to clarify whether he was applying the fireman's rule to this case, the trial judge declined, stating that he thought his oral ruling spoke for itself.

The Court of Special Appeals affirmed the Circuit Court's judgment. After reviewing the policy basis underlying so-called "primary" assumption of the risk (as recognized by jurisdictions other than Maryland), the fireman's rule, and so-called "secondary" assumption of the risk, the intermediate appellate court concluded that the risk of an explosion was within the scope of dangers that Mr. Crews assumed when he accepted employment as a gas leak repairman. Specifically, the court held that:

> [Mr. Crews] 'accept[ed] that responsibility when ... [he] first got hired.' Clearly, there was a direct causal relationship between the performance of [Mr. Crews'] duties as a gas leak repairman and the cause of his injuries. Because [he] knew that his occupation carried with it certain risks, he may not now be heard to complain when one of those job-related foreseeable risks materialized.

*Crews,* 126 Md.App. at 638, 730 A.2d at 758–59. As the Court of Special Appeals explained its ruling that Petitioners' suit was barred by the doctrine of "primary" assumption of the risk, it did not reach the question of whether application of "secondary" assumption of risk would have justified the grant of summary judgment.

## ANALYSIS

### I.

Petitioners urge us to reverse because, in their view, the Circuit Court applied "primary" assumption of the risk, a sub-species of the generic doctrine of assumption of the risk not recognized by this Court. Petitioners assert that "Maryland has never applied the doctrine of primary assumption of risk to [bar suit by] a private citizen" and "the Fireman's Rule cases are the only cases in Maryland where the doctrine of primary assumption of the risk has been applied [as a bar]." Petitioners reason that because Mr. Crews was not a fireman,

police officer, or any of the other types of similar professional rescuers compensated by government, the Circuit Court's application of the fireman's rule and/or the doctrine of primary assumption of the risk was improper.[7]

█ Petitioners' analysis is correct in part. We agree with them that the fireman's rule does not apply to this case. For a different reason than offered by Petitioners we also shall decline to recognize and apply the so-called doctrine of "primary" assumption of the risk as a basis to affirm the judgment. For reasons we shall explain below, we hold that the Circuit Court correctly ruled that Petitioners' suit, under the undisputed material facts presented to that Court, is barred otherwise by the doctrine of assumption of the risk.

█ Assumption of the risk serves as a complete bar to a plaintiff's recovery. *See ADM Partnership v. Martin*, 348 Md. 84, 91, 702 A.2d 730, 734 (1997); *Saponari v. CSX Transp. Inc.*, 126 Md.App. 25, 31, 727 A.2d 396, 399 (1999) *cert. denied Saponari v. CSX Transp. Inc.*, 353 Md. 473, 727 A.2d 382 (1999). The defense is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk. *See Imbraguglio v. Great Atlantic & Pacific Tea Co.*, 358 Md. 194, 212–13, 747 A.2d 662, 672 (2000); *Schroyer v. McNeal*, 323 Md. 275, 282, 592 A.2d 1119, 1122 (1991); *Rogers v. Frush*, 257 Md. 233, 243, 262 A.2d 549, 554 (1970); *Boddie v. Scott*, 124 Md.App. 375, 380, 722 A.2d 407, 409 (1999). In defining the defense of assumption of the risk, we have stated that:

[the defense] rests upon an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of

**7.** As noted *supra,* the trial judge's oral opinion in support of his grant of summary judgment was couched in language broad enough to permit an interpretation that his explanation engulfed any theory of assumption of the risk.

conduct toward him and to take his chances from harm from a particular risk.

*Rogers,* 257 Md. at 243, 262 A.2d at 554.

This Court has not parsed the doctrine of assumption of the risk into primary and secondary categories. Treatise writers and a few other state supreme courts, however, have addressed such a distinction. The perceived doctrinal differences between the two defenses were discussed in Harper, James and Gray, *The Law of Torts* § 21 at 187–89 (1986) as follows:

> The term assumption of risk has led to no little confusion because it is used to refer to at least two different concepts, which largely overlap, have a common cultural background, and often produce the same legal result. But these concepts are nevertheless quite distinct rules involving slightly different policies and different conditions for their application. (1) In its primary sense the plaintiff's assumption of a risk is only the counterpart of the defendant's lack of duty to protect the plaintiff from that risk. In such a case plaintiff may not recover for his injury even though he was quite reasonable in encountering the risk that caused it. *Volenti non fit injuria.* [There is no injury to one who consents.] (2) A plaintiff may also be said to assume a risk created by defendant's breach of duty towards him, when he deliberately chooses to encounter that risk. Hereafter we shall call this 'assumption of risk in a secondary sense.'

*Id.* (footnotes omitted). As Harper, James, and Gray see it, the legal application of the two defenses is quite different. In applying "secondary" assumption of the risk, a court inquires as to whether a plaintiff assumed a particular risk based on a case-by-case or risk-by-risk analysis. *See Flowers v. Sting Sec., Inc.,* 62 Md.App. 116, 135, 488 A.2d 523, 533 (1985), *aff'd. by Flowers v. Rock Creek Terrace Ltd.,* 308 Md. 432, 520 A.2d 361 (1987). The court must determine whether a particular plaintiff intentionally and voluntarily exposed himself or herself to a known risk of danger. *See Baltimore Gas and Elec. Co. v. Flippo,* 348 Md. 680, 705, 705 A.2d 1144, 1158 (1998);

*ADM Partnership v. Martin,* 348 Md. 84, 91, 702 A.2d 730, 734 (1997); *Rogers v. Frush,* 257 Md. 233, 243, 262 A.2d 549, 554 (1970).

Assumption of the risk in its "primary" sense, on the other hand, is a judicially-crafted policy decision, recognized in some states,[8] designed to limit the duty of care that the public owes to certain classes of plaintiffs. *See* Harper, James and Gray, § 21, at 199–200. The duty owed to the plaintiff is limited based on the nature of the plaintiff's occupation and the relationship between his or her occupation and paramount interests of the general public.

■ Petitioners suggest that this Court has applied a semblance of the doctrine of "primary" assumption of the risk in our fireman's rule cases. Under our common law, the fireman's rule bars firefighters (and police officers) from recovering tort based damages inflicted by a negligently created risk that required their presence on the scene in their professional capacity. *See Tucker v. Shoemake,* 354 Md. 413, 731 A.2d 884 (1999).

The instant case shall not serve as a vehicle for this Court to recognize in Maryland a category of the doctrine of assumption of the risk to be known as primary assumption of the risk. This is so because this matter may be decided based on existing Maryland jurisprudence that makes no such distinction.

II.

*Flowers v. Rock Creek Terrace Ltd.,* 308 Md. 432, 520 A.2d 361 (1987) is our seminal case applying the fireman's rule iteration of assumption of the risk. In *Flowers,* a firefighter plunged twelve floors down an elevator shaft while fighting a fire in an apartment building. The firefighter sued ten different defendants to recover damages for his injuries. We held

---

8. *See State v. Turcotte,* 239 N.J.Super. 285, 571 A.2d 305 (App.Div. 1990); *Armstrong v. Mailand,* 284 N.W.2d 343 (Minn.1979); *Krauth v. Geller,* 31 N.J. 270, 157 A.2d 129 (1960).

that the fireman's rule barred the plaintiff from recovery because he was injured by an accident "within the range of anticipated risks of firefighting." *Flowers,* 308 Md. at 451, 520 A.2d at 370.

*Flowers* was based, in part, on certain public policy considerations that are not present in this case. In particular, we explained in *Flowers* that the unique relationship between firefighters and the public serves as a basis of the fireman's rule. *Flowers,* 308 Md. at 446, 520 A.2d at 368. The relationship is premised on the fact that firefighters (or police officers) are trained to confront hazardous situations everyday in order to fulfill their societal and legal duty of protecting the public.

We further noted in *Flowers* that firefighters are entitled to enhanced compensation and benefits in the form of special disability pay, workers' compensation, and retirement benefits and that this special compensation is charged to the taxpayers. *See id.* at 447, 520 A.2d at 368. We reasoned that taxpayers should not be subjected to a double charge for mistakenly causing a fire; one charge in the form of state tax and the second in paying damages in civil suit. *See id.*

■ Because Mr. Crews was a privately-compensated gas line repairman at the time he suffered his injuries, it is evident the foregoing public policy considerations do not apply to the present case and, hence, the fireman's rule is inapplicable as such. We are not inclined to fashion a private employee variation, a private fireman's rule, as it were, for the present case. This does not mean, however, that we shall not find instructive in the present case other aspects of our fireman's rule jurisprudence in our assumption of the risk analysis that follows.

■ Our task in a conventional assumption of the risk analysis is to determine whether the plaintiff 1) had knowledge of the risk of danger; 2) appreciated the risk; and 3)

voluntarily exposed himself or herself to that risk.[9] *ADM Partnership*, 348 Md. at 91, 702 A.2d at 734; *see also Flippo*, 348 Md. at 706, 705 A.2d at 1156; *Schroyer*, 323 Md. at 283, 592 A.2d at 1123; *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 630, 495 A.2d 838, 843 (1985); *Rogers*, 257 Md. at 243, 262 A.2d at 554. In deciding whether a plaintiff had knowledge and appreciation of a particular risk, we apply an objective standard. *See ADM Partnership*, 348 Md. at 92, 702 A.2d at 734. We will not be swayed by a plaintiff's subjective denial that he or she did not comprehend the extent of a clearly obvious danger. *See Gibson*, 245 Md. at 421, 226 A.2d at 275. The question of whether a plaintiff knew and understood the risk in a case is generally one for the trier of fact, but if a person of normal intelligence, in the same position as the plaintiff, would clearly have comprehended the danger, the question is one for the court. *See Schroyer v. McNeal*, 323 Md. 275, 283–84, 592 A.2d 1119, 1123; *Saponari*, 126 Md.App. at 32, 727 A.2d at 399.

As to the element of voluntariness, we seek to ascertain whether the plaintiff freely exposed herself or himself to a known danger. *ADM Partnership*, 348 Md. at 92–93, 702 A.2d at 735. The simple fact that a plaintiff proceeds to confront a danger after he or she has paused to consider the extent of the risks involved does not establish conclusively that the plaintiff acted voluntarily. To satisfy the element of voluntariness, a defendant must show that:

> there [was] no restriction on the plaintiff's freedom of choice either by the existing circumstances or by coercion emanating from the defendant. This is so because ... [e]ven where the plaintiff does not protest, the risk is not assumed

---

9. Because the trial court granted summary judgment in favor of the ·Respondents, our review on appeal is focused on whether there was generated a genuine dispute as to any material fact and, if not, whether the Respondents were entitled to summary judgment as a matter of law. *See* Maryland Rule 2–501. We must construe all reasonable inferences drawn from the facts of this case in the light most favorable to Petitioners and against Respondents. *Liscombe*, 303 Md. at 621–22, 495 A.2d at 839.

where the conduct of the defendant has left him no reasonable alternative. Where the defendant puts him to a choice of evils, there is a species of duress, which destroys the idea of freedom of election.

*Id.* (quoting *Prosser and Keeton on Torts* § 68 at 490–91 (5 [th] ed.1984)). Using these principles as our guide, we shall resolve whether the Circuit Court erred in granting summary judgement on the record before it in this case.

## A. KNOWLEDGE OF THE RISK

■ Mr. Crews plainly knew of the risks inherent in working on the gas leak on 23 March 1996. At his 21 April 1998 deposition, Mr. Crews admitted that he was aware of the heavy smell of gas near the gas leak. In response to a question asking whether there was a point when he recognized the smell of gas to be so heavy that he knew it was dangerous, Mr. Crews responded, "Well, we always are taught that any type of gas leak or odor is always dangerous." Later Mr. Crews conceded again that "we knew that [ ] the area we were working in could be dangerous." The forgoing acknowledgments establish that Mr. Crews possessed the requisite knowledge that risks were present while he worked at the scene of the gas leak.

## B. APPRECIATION OF THE RISK

Petitioners argue that although Mr. Crews may have been aware of the dangers involved in working with gas leaks generally, his deposition statements show that he did not appreciate the specific risks involved in addressing the gas leak that ultimately contributed to his injuries. Petitioners highlight the following excerpt to support their position:

Q. And that static electricity problem you know could cause sparks, correct?

A. No.

Q. No?

A. The only time electric-it causes sparks when you deal with the pipe itself. As I stated before, that's why we have

to use what they call a spray on the pipe before you put a squeeze on it, because when you squeeze the pipe off, that's when—almost gets shut off, that's when the electronic takes over.

Q. How about if you get into close proximity of the pipe or touch the pipe with the metal bucket of a backhoe?

A. No, it would not.

Q. Are you sure?

A. Well, I never knew it could set off like that.

Petitioners suggest that these statements demonstrate that he did not have "the appreciation of danger that is contemplated by Maryland law." We disagree.

As we stated above, "[i]n determining whether a plaintiff had . . . appreciation of the risk, [the] plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him." *ADM Partnership*, 348 Md. at 91, 702 A.2d at 734 (quoting *Gibson v. Beaver*, 245 Md. at 421, 226 A.2d at 275). Mr. Crews's subjective denials of understanding the dangers inherent in working on the gas leak are unavailing when the undisputed facts of this case disclose that the risk of an explosion was plainly evident to him. *See Gibson*, 245 Md. at 421, 226 A.2d at 275.

The record here shows that Mr. Crews, a gas line repairman with over twenty-years experience, was dispatched along with his repair crew, to the scene of the gas leak. Although the record does not disclose how far Mr. Crews traveled to reach the scene of the leak, we know that he was not present when the underground gas line was struck. Therefore, he had to travel some distance to reach the scene. For whatever period he was in transit, natural gas escaped freely into the air. The surrounding neighborhood was evacuated by the fire department. Upon arrival at the scene, Mr. Crews noticed a heavy smell of gas in the area that he was working and he knew that "any type of gas . . . odor is always dangerous."

We have approved the observation that "there are certain risks which anyone of adult age must be taken to

appreciate: the danger of slipping on ice, of falling through unguarded openings, of lifting heavy objects ... of inflammable liquids ... and doubtless many others." *Prosser and Keeton on Torts* § 68 at 490–91 (5 th ed.1984). *Accord ADM Partnership,* 348 Md. at 92, 702 A.2d at 734. (citations committed). The evident risk of an explosion following the rupture of a gas line is among the risks we will recognize as being understood by anyone of an adult age and competency. *See id.*

 Mr. Crews's deposition statements support our conclusion that he appreciated the specific risks involved in using a backhoe to excavate near the gas leak, a possible ignition source. At his deposition, Mr. Crews acknowledged his understanding that the gas leak could lead to an explosion. Immediately following the excerpt quoted above, which Petitioner offered to show that Mr. Crews "had no idea that being in close proximity to a leaking gas pipe with a backhoe could cause an explosion" the following exchange occurred in the deposition:

Q. How about if you get into close proximity of the pipe or touch the pipe with your backhoe?

* * * * *

A. I'm not saying it won't, but I never knew it to do that before. But anything can set [the gas] off, [sparks] from gravels or rocks that hit together, hitting metal. That could set it off.

Q. For instance, the metal bucket of your backhoe striking a rock as you were digging—

A. That's correct.

Q. —you knew that that could create a spark?

A. We knew that.

Q. And you knew that if the spark occurs, you could have a fire and an explosion, correct?

A. That's correct, but as I said before, that it have to be worked, regardless. You know what I mean? It have to be

repaired. It's a chance you have to—that we go through. Then again, there's the other exception to the rule, too.

Q. So you know that there is this risk of fire, correct?

\* \* \* \* \*

A. That's correct.

Mr. Crews statements show that he knew that there was a risk of fire when he confronted the gas leak and it is axiomatic that the dangers associated with fire are understood by an adult of average intelligence. Therefore, it is clear to us that Mr. Crews appreciated the risk of confronting the gas leak. *See Schroyer,* 323 Md. at 283–84, 592 A.2d at 1123. Based on the undisputed facts of this case, including Mr. Crews's admissions, we hold that he appreciated the steps he took when he confronted the gas leak. The remaining question is whether he took those steps voluntarily.

### C. VOLUNTARY EXPOSURE TO THE RISK

 The record in this case shows that Mr. Crews responded to the scene and began to confront the gas leak, but this alone is not enough to conclude that he acted voluntarily. Our cases illustrate that if a person was compelled to act and had no freedom of choice regarding whether to act, we will not say, as a matter of law, that he or she acted voluntarily. *See ADM Partnership,* 348 Md. at 92, 702 A.2d at 734 (quoting *Prosser and Keeton on Torts* § 68 at 490–91 (5 th ed.1984)); *see also Burke v. Williams,* 244 Md. 154, 157–58, 223 A.2d 187, 189 (1966). In the past, we have examined the voluntariness element of assumption of the risk in factual settings where the risks at issue arose during the course of the plaintiffs' discharge of employment duties. Thus, we have considered aspects of a plaintiff's employment as a factor in an assumption of the risk analysis. Because Mr. Crews was acting in his employment capacity when he confronted the gas leak, these cases are instructive.

In *ADM Partnership,* the plaintiff, a delivery driver, sued the owners of a building for injuries she sustained by falling on ice while attempting to deliver copies of blueprints in the

defendants' building. The Circuit Court, at trial, granted the defendants' motion for judgment at the end of the plaintiff's case based on its finding that the plaintiff voluntarily assumed the risk by choosing to walk across an icy parking lot. The Court of Special Appeals reversed, holding that the question of whether the plaintiff acted voluntarily should have been submitted to the jury because the plaintiff testified that she feared her employer would fire her if she failed to make the delivery. We granted the defendants' petition for writ of certiorari to resolve the issue of whether the plaintiff's assumption of the risk was voluntarily when her actions were motivated by the responsibilities of her employment.

At the outset of our analysis, we explained that "an employee's act becomes voluntary when the employee is given a clear and reasonable choice either to act or not to act, and then chooses willingly to act." *ADM Partnership*, 348 Md. at 93, 702 A.2d at 735. (citations omitted). The plaintiff argued that she did not act voluntarily because her only options were to attempt delivery or return in failure to her employer. She testified at trial that she believed if she did not make the delivery her employer would lose the delivery contract and her employment would be terminated. After examination of the record, we rejected the plaintiff's argument.

The only evidence in the record that supported the plaintiff's argument was her own testimony regarding her belief that her employment was at risk. We determined that her subjective testimony, without more, was not enough to create an issue for the jury. We stated that:

[d]etermining whether [the plaintiff] acted voluntarily when she encountered the ice covered walkway or was responding to economic necessity requires proof of her state of mind. Ordinarily, that proof is supplied by direct evidence, i.e., testimony by the person whose state of mind is at issue, or by circumstantial evidence, i.e., testimony concerning facts and circumstances from which the state of mind may be inferred. While the testimony of the affected person ordinarily is sufficient, without more, to support a verdict and thus to generate a jury question ... where the proof of the

state of mind itself depends upon the proof of another fact, the witness's testimony alone will not suffice. There must, in addition, be some evidence of that critical fact [and] there is not a shred of evidence from which [the plaintiff's] concern for her job if the delivery were not made can be inferred.

*Id.* at 100–01, 702 A.2d at 739. (citations omitted). Because there was no evidence in the record to support her belief that her employment was in jeopardy by a compulsion to make the delivery, or any evidence from which such an inference could be drawn, we reversed the judgment of the Court of Special Appeals and affirmed the Circuit Court's grant of judgment to the defendants. *See id.* at 104, 702 A.2d at 740.

In our analysis of *ADM Partnership*, we relied upon *Burke v. Williams*, 244 Md. 154, 223 A.2d 187 (1966). *Burke*, similar to *ADM Partnership*, involved a delivery person's suit against a property owner for injuries sustained from a slip and fall accident. The plaintiff in *Burke* delivered sinks to a house under construction in Prince George's County. When the plaintiff arrived at the house, the property owner directed him to bring the sinks through the house into the kitchen. Because the house was under construction, the plaintiff had to carry the sinks through the house over a walkway made of wooden planks. After two successful trips, the plaintiff slipped on a damp plank and fell into a ditch on his third journey. He sued the homeowner in a negligence action. The homeowner defended by asserting, among other things, that the plaintiff assumed the risk by undertaking to deliver the sinks into the house.

At the close of the plaintiff's case, the trial court granted the defendant's motion for judgment based, in part, on its finding of the plaintiff's voluntary assumption of a known risk. On appeal, the plaintiff asserted that once he arrived at the delivery site his actions were involuntary because the defendant provided him with only one means of ingress and egress to the house via the wooden plank path and, if he did not complete the delivery, he would have been discharged from his job. His argument, in essence, was that he was constrained

by the economic necessity of keeping his job. We affirmed the trial court's judgment because the plaintiff offered no evidence that the defendant or his employer ever demanded that he make the delivery across the pathway into the house and, on the record of the case, the defendant was free to leave the sinks at the entrance of the house. *See id.* at 158, 223 A.2d at 189. In reaching our conclusion, we explained that:

[t]he rule is that when a plaintiff in a personal injury action becomes aware of a previously created risk and voluntarily chooses to put up with the situation-where as here a workman confronted with a slippery walkway nevertheless chose to use it-then his willingness to take a chance is implied and he would be barred from recovering for a risk he chose to assume.

*Id.* 244 Md. at 157–58, 223 A.2d at 189.

To similar effect, in *Brady v. Parsons,* 327 Md. 275, 609 A.2d 297 (1992), we affirmed a jury verdict against a deceased construction worker's estate based, in part, on a jury finding that the deceased voluntarily assumed the risk that caused his death. In that case, the deceased's estate sued the construction-safety manager of a construction site owned by the Mass Transit Administration. The construction worker fell to his death while attempting to attach an aluminum sheet over the top of a train station platform. The estate charged that the defendant was negligent in not providing the deceased with a safe means of performing the tasks of his job. The estate introduced evidence at trial that guardrails, which may have prevented the accident, were not attached to the scaffolding that was used by the deceased construction worker. *See id.* at 287, 609 A.2d at 303.

On appeal, the estate asserted that the deceased's assumption of the risk was not voluntary because he was faced with a choice between encountering the risk of using the incomplete scaffolding or losing his job. We held that the evidence was sufficient to support the jury verdict because there was evidence from which the jury could have concluded that the deceased opted for a faster, yet more dangerous, method of

completing his task. Thus, the jury verdict on the assumption of the risk ground was proper because the estate provided no evidence that the deceased could not have insisted on the use of a safe platform to use while attaching the aluminum sheet. *See id.* at 327 Md. at 289, 609 A.2d at 304. *See also Imbraguglio v. Great Atlantic & Pacific Tea Co.*, 358 Md. 194, 211–13, 747 A.2d 662, 672–73 (2000)(an employee's decision to use an elevated platform without guardrails as a means of repositioning stacked cartons was a voluntary act for assumption of the risk purposes). *Bull S.S. Line v. Fisher,* 196 Md. 519, 77 A.2d 142 (1950), involved a ship's carpenter's suit against a shipping line company. Fisher, the plaintiff, was injured when he was struck by a load of lumber as he was assisting the defendant ship owner's employees in hoisting lumber onto the defendant's ship. At the time of the incident, Fisher's employer had a contract with the ship owner to supply waterfront workers, including carpenters. Fisher, after assisting in loading the lumber on a dolly, strapping it down and attaching a boom hook at the end of a cable leading to a winch hoist operated by the defendant's employees, stepped back "four or five steps, or feet" from the load so that it could be hoisted in the air and moved to the ship. *Bull S.S. Line,* 196 Md. at 522, 77 A.2d at 145. "Fisher said he figured the load would swing some [as it was hoisted], but not exactly the way it did." *Id.* at 522–23, 77 A.2d at 145. He brought suit to recover damages for his injuries and prevailed at trial. One issue advanced by the defense on appeal was "whether the evidence showed that the [plaintiff] had voluntarily assumed the risk which caused his injuries, as a matter of law." *Bull S.S. Line,* 196 Md. at 521, 77 A.2d at 144.

The defendant contended that, due to the plaintiff's vast experience as a ship's carpenter, he "took the chance of risks incident" to his employment, thereby relieving the shipping company of the duty to protect him. *See Bull S.S. Line,* 196 Md. at 526, 77 A.2d at 146. We determined that resolution of the company's argument was dependent on what risks the plaintiff assumed in his capacity as a ship's carpenter. We then offered a test to resolve the question, stating "that every

risk is not necessarily assumed by one who works in a dangerous place or at a dangerous occupation. He assumes only those risks which might reasonably be expected to exist, and, if by some action of the defendant, an unusual danger arises, that is not so assumed." *Id.* We ultimately concluded that we could not say, as a matter of law, that plaintiff's injuries resulted from a risk reasonably expected to exist in his employment. Based on the record in *Bull S.S. Line*, we resolved that the question of whether plaintiff's injuries were caused by a risk inherent in the work of a ship's carpenter was properly left to the jury. *See id.* at 527, 77 A.2d at 147.[10]

In our more contemporary fireman's rule cases, a secondary rationale for existence of the rule is found which is particularly relevant to this case. It focuses not on the public policy considerations of a firefighter as a public servant, but on firefighting as an inherently dangerous occupation. The fireman's rule is based in part on the notion that when an occupation exists wholly or partially for the purpose of confronting dangers posed to the public, it is inappropriate to allow the worker to recover for injures resulting from the very purpose for which he or she is employed. *See Flowers*, 308 *Md.* at 447–48, 520 A.2d at 368. Stated differently, a firefighter who is injured by a risk inherent in the task of firefighting may be barred from asserting claims for those injuries because it is the firefighter's duty to deal with fires and he or she cannot recover damages caused by the reason that made his or her employment necessary. The assumption of the risk analysis intrinsic in the fireman's rule cases focuses on the reasonably identifiable and inherent risks assumed by firefighters when they accept employment in an ostensibly dan-

---

**10.** We most recently relied on *Bull S.S. Line* in *Imbraguglio*, 358 Md. 194, 215–17, 747 A.2d 662, 674 (2000). In *Imbraguglio*, we used the above quoted test to determine "whether a shift in the contents of a bin, while a [warehouse] worker [standing on a wooden pallet hoisted in the air by a forklift] is retrieving dropped cartons, is an expected or unexpected occurrence." 358 Md. 194, 215–17, 747 A.2d 662, 674 (2000). The worker was injured and subsequently died when the shifting cartons caused him to fall from the elevated pallet onto the floor.

gerous occupation. *See Flowers,* 308 Md. at 445, 520 A.2d at 367.

 Based on the above cases, the record before us here, and Petitioner's argument notwithstanding, we conclude that Mr. Crews voluntarily assumed the risk in the present case. Petitioners contend that Mr. Crews was compelled by the exigency of the facts in this case to repair the leak to prevent serious harm to the people and property of the surrounding neighborhood. They argue that Mr. Crews was "faced with the choice of either abandoning the leak and staying in safety, or approaching the pipe and going into danger." Petitioners reason that opting not to act was not a reasonable alternative under the circumstances, therefore he was compelled to address the gas leak.[11]

To be sure, there are ordinarily greater private and public imperatives in repairing a serious gas leak than in the delivery of blueprints (*ADM Partnership* ) or sinks (*Burke* ), the installation of a roof on a rail line stop (*Brady* ), repositioning misaligned stacked cartons (*Imbraguglio* ), or loading a ship (*Bull S.S. Line* ). Although commending Mr. Crews's apparent initiative here, we cannot find in this record any evidence that he was forced to make those efforts or what the larger implications may have been had he not acted.

In reviewing the Circuit Court's grant of summary judgment we shall draw any reasonable inferences from the facts in Petitioners' favor. *See Liscombe,* 303 Md. at 621–22, 495 A.2d at 839. The record, however, is devoid of any facts that Mr. Crews was compelled to choose the course of conduct that he selected. The available facts before the trial· judge at the summary judgment hearing came from the partial transcript of Mr. Crews's deposition. The only reference in the tran-

---

11. As a subpart of their "secondary" assumption of the risk argument before us, Petitioners contend that "the doctrine of assumption of the risk is not available due to the applicability of the rescue [doctrine]." Because Petitioners contend essentially that Mr. Crews was compelled by the urgency of the Bowie gas leak to take action, we resolve Petitioners' rescue doctrine argument by our analysis of whether Mr. Crews voluntarily assumed the risk in this case.

script that remotely suggests any compulsion on Mr. Crews to confront the gas leak, or risk his job, is his response to a question from Maryland Cable's counsel, wherein Mr. Crews stated:

> ... but as I said before, that it have to be worked, regardless. You know what I mean? It have to be repaired. It's a chance you have to—that we go through.

This enigmatic statement, standing alone as it does, fails to explain adequately what actual factors may have forced Mr. Crews to take action. Without greater elaboration, we cannot conclude that his actions were involuntary for purposes of our assumption of the risk analysis. *See ADM Partnership*, 384 Md. at 100–01, 702 A.2d at 739; *Brady*, 327 Md. at 289, 609 A.2d at 304. The unsupported argument in Petitioners' brief that Mr. Crews acted to save the people and the property of the surrounding neighborhood is insufficient to demonstrate there is a genuine dispute as to a material fact. *See Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 70, 509 A.2d 1239, *cert. denied*, 307 Md. 406, 514 A.2d 24 (1986).

Of greater influence on our conclusion, however, is the undisputed evidence that the danger Mr. Crews encountered on Trillium Lane in Bowie on 23 April 1996 is the very danger that he accepted the risk of confronting when he became an employee of Washington Gas some twenty years earlier. In his own words, he accepted that responsibility when he was hired. Thus, the aspect of his job duties that involved fixing gas leaks, a clearly dangerous endeavor, and which he continued to confront for more than twenty years, constitutes a voluntary assumption of "those risks which might reasonably be expected to exist" on 23 April 1996 in Bowie. It seems to us, on this record, that the risk that led to Mr. Crews's injuries was reasonably identifiable and inherent in his job both when he was first hired and on 23 April 1996. Accordingly, we find no error of law in the Circuit Court's grant of summary judgment, on this record, in favor of Respondents.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**