795 A.2d 135

**Andrew BLOOD et ux.**

**v.**

**HAMAMI PARTNERSHIP, LLP et al.**

**No. 89, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

March 29, 2002.

---

Mark Herman, Baltimore, for appellants.

Sharon Chambers, Baltimore (Anthony Dwyer and Michael Reed, Rockville, on the brief), for appellee Hamami.

Francis C. Lanasa (Law Offices of Robert Graham Fiore, on the brief), Towson, for appellee, CR Restaurant, Inc.

Argued before SALMON, DEBORAH S. EYLER and SHARER, JJ.

DEBORAH S. EYLER, Judge.

The Circuit Court for Howard County granted a motion for judgment in favor of Hamami Partnership, LLP ("Hamami"), and CR Restaurant, Inc. ("CR"), the appellees, in a premises liability action brought against them by Andrew Blood, the appellant. On appeal, the appellant asks two questions, which we have rephrased:

I. Did the trial court err in granting the appellees' motion for judgment on the ground that the appellant did not make out a prima facie case of negligence?

II. Did the trial court err in granting the appellees' motion for judgment on the ground that the appellant assumed the risk of his injuries, as a matter of law?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

This case arises out of an accident that occurred on March 16, 1996, behind a Burger King restaurant on Center Park Drive in Howard County. Because we are reviewing the trial court's decision to grant the appellees' motion for judgment at the close of the appellant's case, we shall recite the facts as adduced at trial in the light most favorable to the appellant. *Nelson v. Carroll*, 355 Md. 593, 600, 735 A.2d 1096 (1999) (citing Md. Rule 2–519(b)).

On the day in question, the appellant was working as a driver and delivery man for a food distribution company. The company had been selected to service a food distribution route that included the Burger King on Center Drive, and had started doing so in January or February 1996. The employees running the route would drive a tractor trailer to Delaware in the early morning hours, pick up the products to be delivered, and drive to various destinations in Maryland, delivering the products to the businesses that had ordered them.

By the day of the accident in this case, the appellant had been working for several weeks on the delivery route that included the Burger King on Center Park Drive, and had made between 12 and 24 deliveries to that Burger King. Whenever the appellant rode the route he had a partner with him.

The Burger King in question is located in a portion of a building owned by Hamami. Hamami leased that portion of the building to CR, which operated the Burger King. The

Burger King occupies about one-third of the building. Two other businesses occupy the other two-thirds of the building.

The facades of the Burger King and the two other businesses in Hamami's building face Center Park Drive. As one faces the building, the Burger King occupies the third of the building on the left. The spaces occupied by the three tenants run from the front of the building to the back, in thirds. The carry-out window for the Burger King is on the left side wall of the building, and the "drive-thru" lane to the carry-out window runs along the back of the building and the left side wall.

A sidewalk runs across the entire back of the building. Three doors, all to the rear of the establishments, open onto the sidewalk. One can access the sidewalk from the parking area on the right side of the building (as one faces it). There is a short curb from the parking lot to the sidewalk that has a small built-in concrete ramp, so one can roll a cart on wheels from the parking lot to the sidewalk. Once on the sidewalk, a cart can be rolled to any of the doors at the back of the building, including the Burger King back door.

If one were standing in the Burger King back door looking out, one would see the sidewalk we have just described, and also a short, straight sidewalk, which we shall call a ramp, leading straight over the grass next to the sidewalk and to the drive-thru lane. The ramp is sloped, because the rear of the building is higher than the level of the drive-thru lane. There also are short, straight sidewalks (ramps) leading from the two other back doors to the drive-thru lane. They are not steeply sloped, although they are somewhat sloped.

The area to the back of the building, beyond the drive-thru lane, is the rear parking lot. A small grass median strip runs parallel to the drive-thru lane, dividing it from the rear parking lot.

On the day in question, the appellant and his partner, John Murphy, drove to Delaware in the early morning hours, picked up their product, and made several deliveries before arriving

at the Burger King at about 4 p.m. The Burger King delivery was their second-to-last stop for the day.

The appellant and Murphy drove their tractor trailer to the rear parking lot of the Burger King, and parked. One of them, the appellant does not recall who, went inside the restaurant with their paper work. They then opened the refrigerated section of their truck, unloaded a "block" of six or eight large boxes of frozen french fries, and placed them on a hand truck. The appellant described the blocks as being heavy, about 400 pounds. He stacked them on the hand truck so he could see over them.

The appellant testified that he wheeled the loaded hand truck around the median strip separating the parking lot and the drive-thru lane. He then pushed the hand truck along the drive-thru lane (from left to right, if one were standing in the Burger King back door looking out), to the ramp leading to the Burger King back door. He used a portable curb plate to roll the hand truck onto the ramp.

After taking a couple of steps on the ramp, the appellant "lost [his] footing." He is not sure which of his feet gave way, but thinks it was his right foot. The appellant tried to keep the hand truck from falling backward on him and rolling down the ramp, so he "kind of went down with [his] left leg, left side and just kinda caught the weight of it on [his] forearm." The appellant was hurt and could barely walk. He stayed in the tractor trailer after that, while Murphy completed the delivery.

The appellant testified that he did not know why he lost his footing on the ramp. He further testified that he noticed a dark, discolored area "in the middle of the ramp," that looked like grease, "just the color . . . it just was dark." The ramp had other stains on it, but this was a darker area, in the middle. The appellant had seen the dark area on the ramp before the day of the accident.

According to the appellant, he and his partner always used the ramp to the Burger King back door to wheel product into the Burger King. He thought it was proper for them to use

that ramp because the ramp was directly behind the part of the building occupied by the Burger King. The appellant was never told to use that ramp, however. Moreover, he was not told *not* to use the sidewalk next to the rear of the building or not to use the ramps to the two other back doors of the building. There were no signs or restrictions about which approach to use or not to use.

The evidence established that there was one back door to the Burger King. The sidewalk approach to the Burger King back door—the approach the appellant did not take—would have taken him over the built-in curb plate at the end of the sidewalk, along the sidewalk, which is not heavily sloped, and to the door. The appellant also could have taken a modified version of the sidewalk approach by wheeling his product up either of the two ramps leading to the two other back doors, and then taking the sidewalk to the Burger King back door. The ramp approach to the Burger King back door—the approach the appellant took—went around the median strip, up the drive-thru lane, up the ramp, which had a steep slope, and to the Burger King back door. When asked whether it was "feasible" to take the sidewalk approach to the door, instead of the ramp approach to the door, the appellant answered no. He explained, however, that the sidewalk approach was not feasible because it was a longer route; if he and his partner had used the sidewalk approach, their delivery time would have been twice what it was by using the ramp approach.

As we have noted, before March 16, the appellant had used the ramp to the Burger King back door for deliveries many times. When asked whether, during that time, there was "anything about that ramp that you thought was unusual or dangerous," he responded: "Absolutely. The grade of the ramp. That was foremost in my mind was the pitch of that ramp." He then testified that on more than one occasion before the day of the accident he had told people working in the Burger King that he thought the ramp was unsafe.

The appellant appears to have been pursuing alternative theories of recovery at trial. He called expert witnesses who

testified that the slope of the ramp was steep, and did not meet the standards of the Howard County Building Code. Through Mr. Hamami, who was called adversely, the appellant established that the ramp was added to the building after construction already was underway, and therefore was not included in the building plans approved by Howard County. Thus, one of the appellant's theories was that he lost his footing and slipped because of the dangerously steep slope of the ramp.

The appellant also was attempting to prove, somewhat inconsistently, that he had slipped on an area of grease on the ramp.

In granting the appellees' motion for judgment, the circuit court ruled as follows. First, the court found that no evidence had been presented of what the appellant had slipped on; indeed, the appellant's testimony did not include evidence that he had slipped on any substance at all or, if he had, what the substance was. In addition, there was no evidence connecting the dark area on the ramp to the location of the appellant's foot when he slipped.

Second, with respect to the alleged steepness of the ramp, the court found that even assuming that the steepness of the slope of the ramp would make it unacceptable under county standards, the appellant was fully aware of the condition of the ramp and of the risks attendant to it—and indeed had complained more than once, before the day of the accident, that the ramp was dangerously steep. Nevertheless, and with full knowledge of the danger, he used the ramp. The court concluded that the appellant had assumed the risk of his injuries, as a matter of law.

Additional facts will be recounted as necessary to our discussion of the issues.

## DISCUSSION

### I

The duty of care owed by an owner or occupier of premises is a function of his legal relationship to the person

entering on the premises. In this case, the appellant was a business invitee. Accordingly, he was owed a duty of "reasonable and ordinary care to keep [the] premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover." *Bramble v. Thompson*, 264 Md. 518, 521, 287 A.2d 265 (1972)(citing *Morrison v. Suburban Trust Co.*, 213 Md. 64, 68–69, 130 A.2d 915 (1957); *Peregoy v. Western Md. R.R. Co.*, 202 Md. 203, 207, 95 A.2d 867 (1953)); and *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 355, 517 A.2d 1122 (1986)("landowner's duty to business invitees is to use reasonable and ordinary care to keep his premises in a safe condition and to protect invitees against the dangers of which the landowner is aware or which, with reasonable care, he could have discovered"). Thus, to establish a *prima facie* case of negligence, the appellant needed to adduce evidence showing that there was a dangerous or defective condition on the premises, of which the appellees were aware, and that the appellees failed to exercise ordinary care to make the premises safe by curing the danger or defect.

We agree with the trial court that to the extent that the appellant's theory of negligence was that the ramp was in a dangerous and defective condition because there was a substance on it that made it unsafe to walk on, he failed to make out a *prima facie* case.

The appellant's testimony, viewed in the light most favorable to him, showed only that there was a discolored area on the ramp that he had noticed before the day of the accident; and that he did not know what the discolored area was. Evidence of a discoloration on a ramp that is nothing more than a concrete sidewalk is not proof of a dangerous or defective condition. Discoloration of concrete does not equate to the presence of a substance on the concrete, and there was no evidence presented by the appellant that a substance was present on the ramp. The appellant testified that he did not know why he lost his footing. The mere fact that he lost his

footing did not mean that there was something on the ramp that he slipped on. People sometimes lose their footing when there is nothing defective or out of the ordinary about the surface on which they are walking.

The appellant's evidence, viewed in a light most favorable to him, could not have supported a reasonable jury finding: 1) that there was a slippery substance on the Burger King ramp, or 2) that there was any causal connection between the area of discoloration on the ramp and the appellant's losing his footing. Accordingly, the trial court properly granted the appellees' motion for judgment on this theory.

## II

We also agree with the trial court that, to the extent the appellant was trying to prove negligence on the theory that the steepness of the ramp was a dangerous and defective condition of the property, the appellant's own testimony established that he had assumed the risk of his injury, as a matter of law.

In *Crews v. Hollenbach*, 358 Md. 627, 751 A.2d 481 (2000), the Court of Appeals explained the doctrine of assumption of the risk as follows:

Assumption of the risk serves as a complete bar to a plaintiff's recovery. *See ADM Partnership v. Martin*, 348 Md. 84, 91, 702 A.2d 730, 734 (1997); *Saponari v. CSX Transp., Inc.*, 126 Md.App. 25, 31, 727 A.2d 396, 399 (1999), *cert. denied, Saponari v. CSX Transp., Inc.*, 353 Md. 473, 727 A.2d 382 (1999). The defense is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk. *See Imbraguglio v. Great Atlantic & Pacific Tea Co.*, 358 Md. 194, [212], 747 A.2d 662, 672 (2000); *Schroyer v. McNeal*, 323 Md. 275, 282, 592 A.2d 1119, 1122 (1991); *Rogers v. Frush*, 257 Md. 233, 243, 262 A.2d 549, 554 (1970); *Boddie v. Scott*, 124 Md.App. 375, 380, 722 A.2d 407, 409 (1999). In defining the defense of assumption of the risk, we have stated that:

[the defense] rests upon an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward him and to take his chances from harm from a particular risk.

*Id.* at 640–41, 751 A.2d 481 (quoting *Rogers v. Frush,* 257 Md. at 243, 262 A.2d 549). The rationale underlying the doctrine of assumption of the risk "is that the plaintiff's actions serve as 'a previous abandonment of the right to complain if an accident occurs.'" *ADM Partnership v. Martin,* 348 Md. at 91, 702 A.2d 730 (quoting *Warner v. Markoe,* 171 Md. 351, 359–60, 189 A. 260 (1937)).

To prevail on the defense of assumption of the risk, the defendant must show that the plaintiff: "(1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 630, 495 A.2d 838 (1985).

The first two elements of assumption of the risk— knowledge and appreciation of the risk of danger—must be determined on an objective standard. Thus, a plaintiff "will not be heard to say that he did not comprehend a risk which must have been obvious to him." *Gibson v. Beaver,* 245 Md. 418, 421, 226 A.2d 273 (1967). Moreover, "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." *Schroyer,* 323 Md. at 283–84, 592 A.2d 1119.

In the case at bar, the appellant is not challenging the trial court's ruling respecting the knowledge and appreciation of danger elements of assumption of the risk. We agree that these elements were plainly established by the appellant's testimony that he was aware that the ramp to the Burger King back door was dangerously steep, and indeed he had complained about the pitch of the ramp to people working at the Burger King; but that, even though he "felt [the ramp] was too steep," he used it to approach the Burger King back door.

The appellant's contention of error focuses on the third element of the assumption of risk defense: voluntariness. His argument that the issue of voluntariness was a jury question that should have precluded the court's finding of assumption of the risk as a matter of law is three-fold.

First, the appellant maintains that his testimony that "he believed he had to use the ramp for which [Burger King] was responsible to maintain," would have supported a reasonable finding that he "did not have a viable alternative safe path for delivery" of the products, and therefore did not act voluntarily in taking the ramp approach. Second, the appellant argues that his testimony that it would have taken him twice as long to complete his delivery if he had used the sidewalk approach instead of the ramp approach would have supported a reasonable finding that he did not have a reasonable alternative route, and therefore did not act voluntarily in taking the ramp approach to the Burger King back door. Finally, the appellant argues that his testimony that the sidewalk approach began at the same area in which cars would enter the drive-thru lane, whereas the ramp approach took him across the drive-thru lane at a point beyond which drivers would have stopped their cars to place their orders, also would have supported a reasonable jury finding of non-voluntariness.

Several Maryland cases have addressed the voluntariness of a plaintiff's actions, for purposes of assumption of the risk, when the plaintiff was acting in the course of his or her employment. One of those cases, *ADM Partnership v. Martin, supra*, 348 Md. 84, 702 A.2d 730, is dispositive of the appellant's first argument.

In *ADM Partnership*, the plaintiff, like the appellant, was a delivery driver. While attempting to deliver blueprints to a customer, she fell as she walked across an icy parking lot leading to the customer's office. She sued the building owner for negligence, alleging that it had failed to make the parking lot safe. The trial court granted judgment in favor of the building owner at the close of the plaintiff's case, on a finding that the plaintiff had assumed the risk of her injury, as a

matter of law. This Court reversed, holding that the issue of voluntariness was a jury question.

The Court of Appeals granted *certiorari* and affirmed the trial court, concluding that "there [was] no evidence that [the plaintiff's] act of traversing the ice and snow covered parking lot and walkway was not volitional." 348 Md. at 99, 702 A.2d 730. The Court held that as a matter of law, the plaintiff "exercised [her] own volition in encountering a known danger, and thus voluntarily assum[ed] the risks it entail[ed]." *Id.* at 103, 702 A.2d 730.

The plaintiff in *ADM Partnership* had testified that the only path she could take to access her customer's building was across the icy parking lot. She further had testified that she had believed that if she did not deliver the blueprints, she would lose her job. She argued on appeal that this testimony about her subjective belief was sufficient to make voluntariness a jury question.

The Court of Appeals rejected that argument, on the ground that there was no evidence to show that the fact the plaintiff believed was the case—that she would lose her job if she did not make the delivery—existed, other than in her mind:

> While the testimony of the affected person ordinarily is sufficient, without more, to support a verdict and thus generate a jury question ... where the proof of the state of mind itself depends upon the proof of another fact, the witness's testimony alone will not suffice. There must, in addition, be some evidence of that critical fact [and] there is not a shred of evidence from which [the plaintiff's] concern for her job if the delivery were not made can be inferred.

348 Md. at 100–01, 702 A.2d 730 (citations omitted).

Likewise, in this case, there was no evidence that of the four possible approaches to the Burger King back door—the sidewalk approach, the two approaches using either of the other two ramps and the sidewalk, or the ramp approach that the appellant in fact took—only the ramp approach was permissi-

ble. Thus, the appellant's subjective belief that that was the case was not sufficient to make voluntariness a jury question.

Two other cases that arose in employment contexts, and one that did not, are relevant to the appellant's second argument.

In *Burke v. Williams,* 244 Md. 154, 223 A.2d 187 (1966), the plaintiff, a deliveryman, slipped and fell while delivering sink tops to a house that was under construction. In order to carry the sink tops into the house, he had to traverse across a walkway made of wooden planks. After two successful trips, he slipped on a damp plank and fell, injuring himself. In the plaintiff's suit against the homeowner, the trial court granted the homeowner's motion for judgment (then called a directed verdict) on the ground that the plaintiff had assumed the risk of his injury, as a matter of law.

On appeal, the plaintiff argued that the evidence that the wooden plank path was the only means of entering the house and that he would not have kept his job if he had failed to make the delivery would have supported a jury finding that he did not act voluntarily in taking the wooden plank path. The Court of Appeals rejected that argument, stating:

[T]he rule is that when a plaintiff in a personal injury action becomes aware of a previously created risk and voluntarily chooses to put up with the situation—where as here a workman confronted with a slippery walkway nevertheless chooses to use it—then his willingness to take a chance is implied and he would be barred from recovering for a risk he chose to assume.

\* \* \* \*

The [plaintiff's] contention is clearly without merit because there is no evidence that the owners of the house, or anyone else, ever demanded that the [plaintiff] use the walkway against his will.

244 Md. at 157–58, 223 A.2d 187.

More recently, in *Brady v. Parsons,* 327 Md. 275, 609 A.2d 297 (1992), the Court of Appeals upheld a jury verdict against the estate of a deceased construction worker, on the ground of

assumption of the risk. In that case, the decedent fell to his death when he stood on a scaffold and tried to attach a sheet of aluminum over the top of a train platform. His estate sued the construction safety manager for the work site for negligence, alleging that the manager had not provided a safe means for the decedent to perform his job.

In affirming, the Court of Appeals rejected the estate's argument that the decedent had not voluntarily assumed the risk of falling. The Court pointed to evidence that the decedent himself had directed the assembly of the scaffold without guardrails that would have prevented his fall, and had chosen that method of assembling the scaffold because it was "somewhat faster and easier." *Brady*, 327 Md. at 290, 609 A.2d 297. The Court made plain that those reasons did not render the decedent's actions involuntary for purposes of the doctrine of assumption of the risk. *See also Imbraguglio v. Great Atlantic & Pacific Tea Co.*, 358 Md. 194, 213, 747 A.2d 662 (2000) (commenting that an employee's decision to use an elevated platform without guardrails to reposition stacked cartons was a voluntary act and "[t]he fact that it was more convenient for him to use the unguarded pallet [did] not make his action nonvoluntary").

Finally, in *Schroyer v. McNeal, supra*, 323 Md. 275, 592 A.2d 1119, the Court of Appeals held that a plaintiff's act of walking across an icy portion of a hotel parking lot constituted assumption of the risk as a matter of law, notwithstanding that a jury had ruled in her favor on the issue of contributory negligence. In that case, the plaintiff checked into the hotel after parking her car in the shoveled area of the parking lot next to the hotel's main entrance. She asked for a room next to an unshoveled and icy area of the hotel parking lot, so she could move her belongings directly from her car to her room without making several long trips through the interior of the hotel. The hotel accommodated her request. The plaintiff then parked her car in the unshoveled and icy area of the parking lot and walked across the lot to go to her room. In doing so, she fell on the ice, injuring herself.

The Court explained its holding that the plaintiff had assumed the risk of her injury, as a matter of law:

It is clear, on this record, that [the plaintiff] took an informed chance. Fully aware of the danger posed by an ice and snow covered parking lot and sidewalk, she voluntarily chose to park and traverse it, *albeit* carefully, for her own purposes, *i.e.* her convenience in unloading her belongings. Assuming that the decision to park on the ice and snow covered parking lot and to cross it and the sidewalk was not, itself, contributory negligence, [the plaintiff's] testimony as to how she proceeded may well have generated a jury question as to the reasonableness of her actions. On the other hand, it cannot be gainsaid that she intentionally exposed herself to a known risk. With full knowledge that the parking lot and sidewalk were ice and snow covered and aware that the ice and snow were slippery, [the plaintiff] voluntarily chose to park on the parking lot and to walk across it and the sidewalk, thus indicating her willingness to accept the risk and relieving the [defendants] of responsibility for her safety. Consequently, while the issue of her contributory negligence may well have been for the jury, the opposite is true with respect to her assumption of the risk. We hold, as a matter of law, that [the plaintiff] assumed the risk of her own injuries.

323 Md. at 288–89, 592 A.2d 1119.

These cases on the voluntariness element of the assumption of the risk doctrine illustrate that in Maryland, "if a person was compelled to act and had no freedom of choice regarding whether to act," he will not be said to have acted voluntarily, as a matter of law. *Crews v. Hollenbach,* 358 Md. at 648, 751 A.2d 481. Conversely, because voluntariness in this facet of the law connotes volition, not reasonableness, a plaintiff will not be said to have acted non-voluntarily if he had a choice to exercise in how to act and chose a way of acting that carried a known and understood danger—even if his choice was reasonable under the circumstances. *Schroyer, supra,* 323 Md. at 288–89, 592 A.2d 1119.

■ Applying these principles to the case at bar, we conclude that the appellant's second voluntariness argument lacks merit. According to the appellant's evidence, given the location available in the parking lot for his tractor-trailer, it would have taken him twice as long to deliver the product to Burger King's back door via the sidewalk approach, or the two modified sidewalk approaches, than by the ramp approach, which he knew to be a dangerous approach. The most this evidence could establish, however, was that the appellant, for his own convenience, chose to save time by approaching the Burger King back door via a ramp he knew to be dangerous. While, on this evidence, a jury properly might have found the appellant to have acted reasonably, it could not have found that he did not act with volition. There simply was no evidence in this case from which a reasonable jury could find that the appellant was compelled to walk up the dangerously steep ramp he fell on.

So, too, the appellant's third argument fails. He maintains that in choosing between the sidewalk approach and the ramp approach he selected the ramp approach because he thought it posed less of a traffic risk. The sidewalk approach began where cars would enter the drive-thru lane; the ramp approach began farther up that driveway, beyond the point where drivers would stop to place their orders. Again, this evidence did not show that the appellant was compelled to take the route he did. Moreover, the appellant did not introduce any evidence of traffic on any portion of the parking lot or drive-thru lane when the accident occurred. Thus, the danger he posited respecting the sidewalk approach to the back door was hypothetical, and only could become actual upon the existence of an additional fact that was not proven. Finally, this argument ignores that the appellant had two other approaches he could have taken—the modified sidewalk approaches, using either of the other ramps, and the sidewalk—neither one of which would have placed him at the entry of the drive-thru lane.

The trial court properly ruled that on the facts introduced into evidence by the appellant and viewed in a light most

favorable to him, the appellant assumed the risk of his injury, as a matter of law.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**